FILED
United States Court of Appeals
Tenth Circuit

January 5, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

JESUS ESPINOZA, JR.,

Plaintiff - Appellant,

v.

ARKANSAS VALLEY
ADVENTURES, LLC,

Defendant - Appellee.

--------------------------------------

COLORADO TRIAL LAWYERS
ASSOCIATION,

Amicus Curiae.

No. 14-1444

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:13-CV-01421-MSK-BNB)

William J. Hansen of McDermott & McDermott, LLP, Denver, CO (George E.
McLaughlin of Warshauer McLaughlin Law Group, P.C., Denver, CO, with him
on the briefs), for Plaintiff-Appellant.

Alan Epstein (Ryan L. Winter and Conor P. Boyle, with him on the brief), of Hall
& Evans, L.L.C., Denver, CO, for Defendant-Appellee.

Russell R. Hatten and Evan P. Banker of Chalat Hatten Koupal & Banker PC,
Denver, CO, on the brief for amicus curiae Colorado Trial Lawyers Association,
in support of Plaintiff-Appellant.

Before **KELLY**, **HARTZ**, and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

This case arises from a summer rafting trip gone tragically wrong. It began when Sue Ann Apolinar hired a guide for a family adventure in the Colorado Rockies: an overnight rafting and camping excursion on a popular stretch of the Arkansas River running through Brown's Canyon. After she arrived at the outfitter's office, Ms. Apolinar and the other rafters received the usual guidance, made the usual preparations, and signed the usual release before heading down river. The next day, while maneuvering around a rapid known locally as Seidel's Suck Hole, the raft capsized. Everyone else was fished out of the water soon enough. But in a heartbreaking turn of events, the current swept Ms. Apolinar into a logjam where, despite repeated efforts to save her, she drowned. Eventually, Ms. Apolinar's son, Jesus Espinoza, Jr., brought a lawsuit against the rafting company alleging negligence per se and fraud (and other claims no longer in dispute). In reply, the company sought summary judgment, arguing that the release Ms. Apolinar signed shielded it from liability. With this the district court agreed and proceeded to enter judgment for the company. It's the propriety of this ruling that we're asked to assess in this appeal.

No one before us doubts that Ms. Apolinar signed a release. Or that the release purported to absolve the rafting company from any claim of negligence. The only question in this appeal is whether Colorado law permits private parties to enforce a contract like this. Under Colorado common law, it's long settled that courts will not give effect to contracts purporting to release claims for intentional, knowing, or reckless misconduct. *See, e.g.*, *Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 726 (Colo. 2010). But claims of negligence are a different matter. Colorado common law does not categorically prohibit the enforcement of contracts seeking to release claims of negligence. Instead, and at the most general level, the Colorado Supreme Court has instructed courts to weigh four factors when deciding whether to give effect to agreements along these lines: "(1) the existence [or nonexistence] of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981).

Even more specifically, the Colorado Supreme Court has explained that the first two *Jones* factors focus on public policy questions — asking whether "[t]he party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity [and] . . . [a]s a result of the essential nature of the service . . . the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who

3

seeks his services." *Id.* (quoting *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 444 (Cal. 1963)). Meanwhile, the latter two factors focus on more party- and contract-specific questions — asking whether the release was fairly obtained and clearly and unambiguously expressed. *Id.* at 378. If the release satisfies both sets of questions — the more general and the more particular — it may be enforced. (Provided, of course, that it is otherwise a valid contract, involving, for example, mutual assent and consideration, matters not in dispute here).

When it comes to the first two *Jones* factors, the Colorado Supreme Court has offered even more specific guidance yet. Though some businesses perform essential public services and owe special duties to the public, the court has held that "businesses engaged in recreational activities" generally do not. *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004); *see also Boles*, 223 P.3d at 726 ("More than a quarter century ago, this court rejected the assertion that any agreement purporting to shield a party from liability for its own tortious conduct" in the provision of recreational services "would violate . . . public policy . . . ."). So while businesses providing, say, water, electricity, or sanitary services usually may not shield themselves from claims of negligence, recreational service providers often can. Though, of course, they must still face and satisfy the latter two case-specific *Jones* factors.

This relatively permissive public policy toward recreational releases may not be unique to Colorado common law but it does seem to be one of its

4

distinguishing features. We don't doubt other states may rationally choose to pursue different lines when it comes to recreational releases: certainly the parties before us cite an array of cases from other jurisdictions taking an array of views. But in our federal system, states are usually permitted (and encouraged) to pursue their own paths on policy matters like these. And it's clear enough that Colorado allows private parties to assume some of the risks associated with their recreational pursuits. It's a policy choice that, no doubt, means some losses go uncompensated but one that also promotes the output and diversity of recreational services consumers may enjoy. Of course, the Colorado Supreme Court and the Colorado General Assembly may change their judgment on this score at any time. And maybe someday they will prefer a policy that shifts the burden of loss to the service provider, ensuring compensation in cases like this even if also impairing to some degree individual choice and output. But that decision is their decision to make, not ours, and their current policy is clear. Indeed, following the Colorado Supreme Court's guidance in this area, this court and many Colorado courts have upheld many releases in many recreational activities over many years. Only some examples of which we include in the margin.[1]

---

[1] *See, e.g.*, *Lahey v. Covington*, 964 F. Supp. 1440, 1444-46 (D. Colo. 1996) (whitewater rafting), *aff'd sub nom. Lahey v. Twin Lakes Expeditions, Inc.*, 113 F.3d 1246 (10th Cir. 1997); *Forman v. Brown*, 944 P.2d 559, 563-64 (Colo. App. 1996) (same); *Robinette v. Aspen Skiing Co.*, No. 08-cv-00052-MSK-MJW, 2009 WL 1108093, at *3-5 (D. Colo. Apr. 23, 2009) (skiing), *aff'd*, 363 F. App'x 547 (10th Cir. 2010); *Fullick v. Breckenridge Ski Corp.*, No. 90-1377, 1992 WL

Still, Mr. Espinoza submits, his case is categorically different. Yes, Ms. Apolinar signed a document purporting to release the rafting company from all claims of negligence. Yes, Colorado public policy generally permits the release of claims of negligence in recreational pursuits like the one here. But, Mr. Espinoza argues, the release Ms. Apolinar signed should still be held to violate state public policy — it should still be held to run afoul of the first two *Jones* factors — because his claim is one for negligence per se rather than common law negligence. He observes that the Colorado River Outfitters Act (CROA) makes it a misdemeanor for rafting companies to operate any raft in a "careless or imprudent manner." Colo. Rev. Stat. § 33-32-107(2)(b). And from this, he reasons, negligence by rafting companies has become a matter of public concern and a public service within the meaning of the first two *Jones* factors.

95421, at \*3 (10th Cir. Apr. 29, 1992) (same); *Potter v. Nat'l. Handicapped Sports*, 849 F. Supp. 1407, 1409-11 (D. Colo. 1994) (same); *Bauer v. Aspen Highlands Skiing Corp.*, 788 F. Supp. 472, 474-75 (D. Colo. 1992) (same); *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1113 (10th Cir. 2002) (mountain biking); *Chadwick*, 100 P.3d at 468-70 (horseback riding); *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 137-38 (Colo. 1998) (same); *see also* William R. Rapson & Stephen A. Bain, *Recreational Waivers in Colorado: Playing at Your Own Risk*, 32 Colo. Law. 77, 77 (2003) (noting that "Colorado law generally supports waivers of liability in connection with recreational activities"); James H. Chalat, *Colorado Ski Law*, 27 Colo. Law. 5, 14 (1998) (noting that "courts generally hold [ski racing] waivers to be enforceable"); Jordan Lipp, *Horse Law — A Look at the Equine Statute and Liability Law*, 41 Colo. Law. 95, 99 (2012) ("Releases have been upheld in a number of horseback riding cases.").

We find ourselves unable to agree for a number of related reasons.

First, we think this argument mistakes the nature of the inquiry called for by the first two *Jones* factors. By their terms, those factors don't ask whether the activity in question is the subject of some sort of state regulation. Instead, they ask whether the service provided is of "great importance to the public," a matter of "practical necessity" as opposed to (among other things) a "recreational" one. 623 P.2d at 376-77. And the distinction the *Jones* factors draw between essential and recreational services would break down pretty quickly if the presence of some state regulation were enough to convert an otherwise obviously "recreational" service into a "practically necessary" one. After all, state law imposes various rules and regulations on service providers in most every field these days — including on service providers who operate in a variety of clearly recreational fields. *See, e.g.*, Colo. Rev. Stat. § 33-14-116 (snowmobiling); *id.* § 33-44-104(2) (skiing); *id.* § 13-21-119(4)(b)(I) (equine activities).

Second, Mr. Espinoza's argument suggests a firmer analytical line can be drawn between claims of negligence and negligence per se than we think the circumstances here will fairly allow. As we've seen, Colorado law has long permitted parties to contract away negligence claims in the recreational context. And negligence per se claims often differ very little from their common law cousins: they usually just substitute a common law duty or standard of care with one prescribed by statute and all other elements remain the same. *See Lombard v.*

7

*Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 573 (Colo. 2008). In fact, in the case before us it's not even clear what duty of care CROA adds to the common law. Mr. Espinoza says the rafting company violated the statutory duty to avoid operating a raft in a "careless or imprudent manner." Mr. Espinoza points as well to implementing regulations that suggest a company should offer things like a "basic orientation" for rafters and help when accidents occur. But Mr. Espinoza does not suggest how these provisions create any distinctly new duty of care. Indeed, they appear to be more or less coextensive with the preexisting common law standard of care, which requires parties to act with "reasonable care . . . i.e., that which a person of common prudence would use under the circumstances." *Christensen v. Hoover*, 643 P.2d 525, 529 (Colo. 1982). And given this it seems hard to see a rational basis on which the law might treat such similar (identical?) claims so differently based merely on how they are pleaded, rewarding the crafty but penalizing the pedestrian pleader.[2]

Third, Mr. Espinoza's interpretation of CROA would require us to read into that statute a good deal more than it says. CROA imposes criminal misdemeanor sanctions for violating the duties it prescribes. It does not speak, one way or the other, to the question of civil liability — let alone suggest that private parties are

_____

[2] Though we do not rely on the fact in our analysis above, Colorado authorities did conduct an investigation of the accident in this case pursuant to CROA and ultimately decided not to pursue any sanction.

8

forbidden from contractually releasing potential negligence claims. Neither is it obviously irrational that the General Assembly might choose to pass legislation about public (criminal) liability but leave private (civil) liability to preexisting common law principles. Indeed, courts generally will not assume that the General Assembly means to displace background common law principles absent some clear legislative expression of that intent. *See Robbins v. People*, 107 P.3d 384, 387 (Colo. 2005). The General Assembly, too, has shown that — when it wishes — it well knows how to displace background common law norms and preclude the release of civil claims. *See, e.g.*, *Stanley v. Creighton Co.*, 911 P.2d 705, 707-09 (Colo. App. 1996). Given all this, we do not think it our place to adorn the General Assembly's handiwork with revisions to the common law that it easily could have but declined to undertake for itself.

Finally, we find it noteworthy that Colorado courts faced with similar challenges seem to have resolved them much as we resolve this one today. For example, the General Assembly has adopted a statute holding that "equine professional[s]" may not be held civilly liable for "the inherent risks of equine activities." Colo. Rev. Stat. § 13-21-119(3). But that statute goes on to state that the immunity it provides does not extinguish civil liability in cases where the equine professional supplied equipment or tack it should have known was faulty or failed to make reasonable efforts to determine the ability of the rider before the excursion began. *Id.* § 13-21-119(4)(b)(I). And despite the General Assembly's

9

express solicitude toward these latter classes of claims, the Colorado Supreme Court has allowed private parties to contract away claims of negligence on both fronts. *B & B Livery*, 960 P.2d at 135, 137-38. Maybe even more pointedly still, since the enactment of CROA and its misdemeanor criminal penalties, various Colorado courts have enforced releases of civil negligence claims obtained by whitewater rafting companies. *See, e.g.*, *Lahey*, 964 F. Supp. at 1444-46; *Forman*, 944 P.2d at 563-64. This court has upheld, too, a release a snowboarder gave to a ski area absolving its employees of negligence even when the area's employee allegedly operated a snowmobile in a negligent manner and a state statute made that very behavior a misdemeanor. *See Robinette*, 2009 WL 1108093, at *3-5.

In saying this much, we take care to emphasize what we do not mean to say. We do not mean to suggest that some future statute could not — or even that some other current statute might not — preclude the enforcement of releases like the one here. Neither do we mean to suggest that the Colorado Supreme Court could not alter its common law policy with respect to recreational releases. In particular, we do not pass on the question whether the General Assembly's enactment of the Colorado Consumer Protection Act (CCPA), Colo. Rev. Stat. §§ 6-1-101 to 6-1-1001, might preclude the enforcement of recreational releases when the plaintiff pleads a valid claim under that statute. *See* Rapson & Bain, *supra*, at 77-78 (noting that while Colorado law "generally supports" recreational

10

waivers, it's an open question whether a statutory CCPA claim can be waived). In this case, we merely hold that the CROA provisions cited to us do not satisfy and do not overrule the first two factors of the common law *Jones* test.

Of course, that takes us only half way. Having decided that the release survives *Jones*'s public-policy factors, we must still consider its case-specific factors. The third *Jones* factor requires us to ask whether "the circumstances and the nature of the service involved indicate that the contract was fairly entered into." *Chadwick*, 100 P.3d at 467. Relatedly, the fourth *Jones* factor addresses the terms of the contract itself, inviting us to "examine[] the actual language of the [release] for legal jargon, length and complication" and any other evidence that a party might not "recognize the full extent of the release provisions." *Id.* The district court held that the release before us satisfied both of these conditions — that it was fairly entered into and clear in its terms. And in the end we find we agree with its assessment on this score too.

Mr. Espinoza trains most of his attention on the third factor. He contends that the rafting company misrepresented the nature of the trip to Ms. Apolinar. He points for support to testimony suggesting that, when Ms. Apolinar first made her reservation, she was told by company representatives and read on its website that the trip was appropriate for beginners and involved at most only class III rapids. He points as well to his expert witness who testified that Seidel's Suck Hole is really a class IV rapid, not a class III rapid, according to the

11

"International Scale of River Difficulty."[3]  But at the same time Mr. Espinoza must acknowledge that another of his witnesses — a state ranger charged with overseeing the stretch of river in question — testified that he believes the trip is indeed appropriate for families with children.  So the facts Mr. Espinoza himself offers are mixed at best on whether the rafting company actually ever made a material misstatement about the nature of the trip.[4]

Still, even if we might assume (without deciding) that the facts here are enough to create a material dispute of fact regarding whether the rafting company initially misrepresented the nature of the trip, it's still hard to see how we could say the release was unfairly secured or unclear in its terms — at least within the meaning Colorado law gives to the third and fourth *Jones* factors.  That's because

---

[3]  That scale describes class III rapids as requiring (among other things) "[c]omplex maneuvers in fast current and good boat control in tight passages or around ledges" and notes that "[i]njuries while swimming are rare."  The scale describes class IV rapids as involving "[i]ntense, powerful but predictable rapids requiring precise boat handling in turbulent water. . . . [and] fast maneuvers under pressure" and notes that the "[r]isk of injury to swimmers is moderate to high."

[4]  On appeal, Mr. Espinoza offers another theory why the circumstances surrounding the release were unfair.  He alleges that the rafting company refused to reschedule the trip and might have refused to refund Ms. Apolinar's deposit if she declined to sign the release.  And this, he says, imposed unfair pressure on her to sign the release.  But Mr. Espinoza's argument along these lines before the district court consisted of only two sentences so it's not surprising or improper that the district court declined to pass upon it.  Neither will we pass on this argument for the first time now, leaving its development instead to future cases where it might prove relevant and more fully presented.  *See generally Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998); *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127-28 (10th Cir. 2011).

of what happened next.  Whatever the rafting company said about the trip earlier on, when Ms. Apolinar arrived at the outfitter's office she received a vivid description of the risks she could face.  The rafting company provided — and Ms. Apolinar signed — a document titled in part "RAFTING WARNING" explaining that rafting can be "HAZARDOUS AND INVOLVES THE RISK OF PHYSICAL INJURY AND/OR DEATH."  The document proceeded to offer a detailed picture of the sorts of problems that could be (and sadly were) encountered:  "cold water immersion, hidden underwater obstacles, trees or other above water obstacles, . . . changing and unpredictable currents, drowning, exposure, swimming, overturning, . . . entrapment of feet or other body parts under rocks or other objects . . . ."  It added that "THE UNDERSIGNED ACKNOWLEDGE[S] AND UNDERSTAND[S] THAT THE DESCRIPTION OF THE RISKS LISTED ABOVE IS NOT COMPLETE AND THAT PARTICIPATING IN THE ACTIVITY MAY BE DANGEROUS AND MAY INCLUDE OTHER RISKS."  The document provided, too, that its representations and warnings about the trip superseded any prior "communications or representations" on these subjects.  Neither can there be any question that the document clearly communicated that a signature would release civil claims for liability.  At the outset it directed Ms. Apolinar to "PLEASE READ CAREFULLY BEFORE SIGNING.  THIS IS A RELEASE OF LIABILITY & WAIVER OF LEGAL RIGHTS."  And later it provided that "THE UNDERSIGNED HEREBY IRREVOCABLY AND

13

UNCONDITIONALLY RELEASE[S], FOREVER DISCHARGE[S], AND AGREE[S] NOT TO SUE . . . with respect to any and all claims and causes of action . . . which could be asserted [by] the Undersigned in connection with . . . the Activity."

This disclosure and release suffices to satisfy the third and fourth *Jones* factors. To be sure, we can imagine other states might choose to hold circumstances and printed forms like these insufficiently fair or clear. But Colorado courts have repeatedly emphasized that individuals engaged in recreational activities are generally expected to read materials like these, and because recreational businesses do not provide "essential" services of "practical necessity" individuals are generally free to walk away if they do not wish to assume the risks described. *See, e.g.*, *Jones*, 623 P.2d at 377-78. Particularly where, as here, the person confronted with the release is competent and reasonably educated. *Chadwick*, 100 P.3d at 469. Indeed, Colorado courts and this court have consistently found releases provided at the outset of a recreational activity and containing language very much like the one now before us sufficient as a matter of law to supply a fair and full warning within the meaning of the latter two *Jones* factors. *See, e.g.*, *Jones*, 623 P.2d at 377-78; *Brooks v. Timberline Tours, Inc.*, 127 F.3d 1273, 1274-76 (10th Cir. 1997); *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 782, 785 (Colo. 1989); *Chadwick*, 100 P.3d at 468-69.

14

As the district court recognized, too, this resolution of the third and fourth *Jones* factors also resolves Mr. Espinoza's fraud claim. To make out a claim for fraud in Colorado, a plaintiff must establish actual and reasonable reliance on a false statement; a party cannot — as a matter of law — continue to rely on a previously expressed false statement after the truth is aired. And, of course, we have just found that the rafting company's written warnings accomplished just that — adequately airing the truth about the nature of the risks Ms. Apolinar faced. Neither do we see how we might arrive at a different result just because this claim is denominated in fraud rather than negligence. The inquiries prescribed for us by law are virtually indistinguishable (was the truth fairly and fully disclosed?), the facts are the same (the release's warnings), and it follows that the result should be the same. *See Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (holding if a party "has access to information" that "would have led to the true facts, that party has no right to rely on a [prior] false representation"); *Morrison v. Goodspeed*, 68 P.2d 458, 462 (Colo. 1937) (same).

Enduring the death of a close family member in tragic circumstances is among life's bitterest challenges. The loss Ms. Apolinar's family has suffered is

15

beyond words.  But our charge is to follow the law.  And in this case the law is just as the district court described it, permitting the enforcement of the release in this case and requiring the entry of summary judgment.

Affirmed.[5]

---

[5] We decline Mr. Espinoza's request for certification of his negligence per se claim to the Colorado Supreme Court for decision.  Not only is the request fleetingly made (three sentences in the middle of a brief arguing state law unambiguously supports his position), we generally do not trouble state supreme courts where, as here, existing state law provides "a reasonably clear and principled course" we may follow to resolve the case at hand.  *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007).

14-1444, *Espinoza v. Arkansas Valley Adventures*

**HARTZ**, Circuit Judge, concurring and dissenting:

I fully join all the opinion except the discussion of the third *Jones* factor. I respectfully dissent, however, on that factor. In my view, a jury must resolve whether Ms. Apolinar was misled about the danger of the rapids. Although the warning provided to her at the outfitter's office listed all the potential risks that she would face, the description of the rapids is what would convey the probability of those risks. It is not enough to list a risk if the customer has been misled about its probability.