**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 8, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TERESA BRIGANCE,

    Plaintiff - Appellant,

v.

VAIL SUMMIT RESORTS, INC.,

    Defendant - Appellee.

No. 17-1035

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-01394-WJM-NYW)**
_____

Trenton J. Ongert (Joseph D. Bloch with him on the briefs), Bloch & Chapleau, LLC, Denver, Colorado, for Plaintiff - Appellant.

Michael J. Hofmann, Bryan Cave LLP, Denver, Colorado, for Defendant - Appellee.
_____

Before **PHILLIPS**, **KELLY**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

During a ski lesson at Keystone Mountain Resort ("Keystone"), Doctor Teresa

Brigance's ski boot became wedged between the ground and the chairlift. She was unable

to unload but the chairlift kept moving, which caused her femur to fracture. Dr. Brigance

filed suit against Vail Summit Resorts, Inc. ("VSRI"), raising claims of (1) negligence,

(2) negligence per se, (3) negligent supervision and training, (4) negligence (respondeat superior), (5) negligent hiring, and (6) violation of the Colorado Premises Liability Act (the "PLA"), Colo. Rev. Stat. § 13-21-115. The district court dismissed Dr. Brigance's negligence and negligence per se claims at the motion to dismiss stage. After discovery, the district court granted VSRI's motion for summary judgment on the remaining claims, concluding the waiver Dr. Brigance signed before participating in her ski lesson, as well as the waiver contained on the back of her lift ticket, are enforceable and bar her claims against VSRI. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. Factual Background

Keystone is a ski resort located in Colorado that is operated by VSRI. In March 2015, Dr. Brigance visited Keystone with her family and participated in a ski lesson. At the time, ski lesson participants, including Dr. Brigance, were required to sign a liability waiver (the "Ski School Waiver") before beginning their lessons. The Ski School Waiver signed[1] by Dr. Brigance contained, among other things, the following provisions:

_____

[1] Although VSRI did not produce an original or copy of the Ski School Waiver signed by Dr. Brigance, it provided evidence that all adults participating in ski lessons at Keystone are required to sign a waiver and that the Ski School Waiver was the only waiver form used by VSRI for adult ski lessons during the 2014-15 ski season. Before it was clear that VSRI could not locate its copy of the signed waiver, Dr. Brigance indicated in discovery responses and deposition testimony that she signed a waiver before beginning ski lessons. *See Brigance v. Vail Summit Resorts, Inc.* ("*Brigance II*"), No. 15-cv-1394-WJM-NYW, 2017 WL 131797, at *3–4 (D. Colo. Jan. 13, 2017). Based on this evidence and Dr. Brigance's failure to argue "that

2

a genuine question remains for trial as to whether she did in fact sign the Ski School Waiver in the form produced or whether she agreed to its terms," *id.* at \*4, the district court treated her assent to the Ski School Waiver as conceded and concluded that "there is no genuine dispute as to whether [Dr. Brigance] consented to the terms of the Ski School Waiver," *id.*

On appeal, Dr. Brigance offers no argument and points to no evidence suggesting that the district court's conclusion was erroneous in light of the evidence and arguments before it. Instead, she merely denies having signed the Ski School Waiver and reiterates that VSRI has yet to produce a signed copy of the waiver. But in response to questioning at oral argument, counsel for Dr. Brigance conceded that this court could proceed with the understanding that Dr. Brigance signed the Ski School Waiver. Oral Argument at 0:41–1:23, *Brigance v. Vail Summit Resorts, Inc.*, No. 17-1035 (10th Cir. Nov. 13, 2017). Three days later, counsel for Dr. Brigance filed a notice with the court effectively revoking that concession.

Dr. Brigance's assertion that she did not execute the Ski School Waiver is forfeited because she failed to adequately raise it as an issue below. *Avenue Capital Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 884 (10th Cir. 2016); *see also Brigance II*, 2017 WL 131797, at \*4 ("[N]otwithstanding the absence of a signed copy of the [Ski School Waiver], [Dr. Brigance] does not argue that this issue presents a genuine dispute requiring trial."). But even if we were to entertain the argument, it would fail to defeat summary judgment. Despite her obfuscation, VSRI's inability to produce the signed Ski School Waiver and Dr. Brigance's assertions that she did not sign the waiver—which contradict her discovery responses and deposition testimony—are insufficient to establish that the district court erred in concluding that no genuine dispute exists as to whether Dr. Brigance agreed to the terms of the waiver. "Although the burden of showing the absence of a genuine issue of material fact" rests with the movant at summary judgment, "the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (internal quotation marks omitted). Indeed, the

> party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)–(B). Dr. Brigance made no such showing below, nor does she attempt to do so on appeal.

**THIS IS A RELEASE OF LIABILITY & WAIVER OF CERTAIN LEGAL RIGHTS.**

. . .

**2.** I understand the dangers and risks of the Activity and that the Participant **ASSUMES ALL INHERENT DANGERS AND RISKS** of the Activity, including those of a "skier" (as may be defined by statute or other applicable law).

**3. I expressly acknowledge and assume all additional risks and dangers that may result in** . . . **physical injury and/or death <u>above and beyond</u> the inherent dangers and risks of the Activity, <u>including but not limited to</u>**: Falling; free skiing; following the direction of an instructor or guide; . . . equipment malfunction, failure or damage; improper use or maintenance of equipment; . . . the negligence of Participant, Ski Area employees, an instructor . . . or others; . . . lift loading, unloading, and riding; . . . . **I UNDERSTAND THAT THE DESCRIPTION OF THE RISKS IN THIS AGREEMENT IS <u>NOT</u> COMPLETE AND VOLUNTARILY CHOOSE FOR PARTICIPANT TO PARTICIPATE IN AND EXPRESSLY ASSUME <u>ALL</u> RISKS AND DANGERS OF THE ACTIVITY, WHETHER OR NOT DESCRIBED HERE, KNOWN OR UNKNOWN, INHERENT OR OTHERWISE**.

**4.** Participant assumes the responsibility . . . for reading, understanding and complying with all signage, including instructions on the use of lifts. Participant must have the physical dexterity and knowledge to safely load, ride and unload the lifts. . . .

. . .

**6.** Additionally, in consideration for allowing the Participant to participate in the Activity, **I AGREE TO HOLD HARMLESS, RELEASE, INDEMNIFY, AND NOT TO SUE [VSRI] FOR ANY** . . . **INJURY OR LOSS TO PARTICIPANT, INCLUDING DEATH, WHICH PARTICIPANT MAY SUFFER, ARISING IN WHOLE OR IN PART OUT OF PARTICIPANT'S PARTICIPATION IN THE ACTIVITY, INCLUDING, BUT NOT LIMITED TO, THOSE CLAIMS BASED ON [VSRI's] ALLEGED OR ACTUAL NEGLIGENCE** . . . .

Aplt. App'x at 117 (emphasis in original).

4

In addition, Dr. Brigance's husband purchased a lift ticket enabling her to ride the ski lifts at Keystone. Dr. Brigance received the ticket from her husband and used it to ride the Discovery Lift. The lift ticket contained a warning and liability waiver (the "Lift Ticket Waiver") on its back side, which provides in pertinent part:

> **HOLDER AGREES AND UNDERSTANDS THAT SKIING** . . .
> **AND USING A SKI AREA, INCLUDING LIFTS, CAN BE**
> **HAZARDOUS.**
> **WARNING**
> Under state law, the Holder of this pass assumes the risk of any injury to person or property resulting from any of the inherent dangers and risks of skiing and may not recover from the ski area operator for any injury resulting from any of the inherent dangers and risks of skiing. Other risks include cliffs, extreme terrain, jumps, and freestyle terrain. Holder is responsible for having the physical dexterity to safely load, ride and unload the lifts and must control speed and course at all times. . . . Holder agrees to **ASSUME ALL RISKS**, inherent or otherwise. Holder agrees to hold the ski area harmless for claims to person or property. . . .
>
> . . .
>
> **NO REFUNDS. NOT TRANSFERABLE. NO RESALE.**

*Id.* at 121 (emphasis in original).

After receiving some instruction during her ski lesson on how to load and unload from a chairlift, Dr. Brigance boarded the Discovery Lift. As Dr. Brigance attempted to unload from the lift, her left ski boot became wedged between the ground and the lift. Although she was able to stand up, she could not disengage the lift because her boot remained squeezed between the ground and the lift. Eventually, the motion of the lift pushed Dr. Brigance forward, fracturing her femur.

5

## B. Procedural Background

Dr. Brigance filed suit against VSRI in the United States District Court for the District of Colorado as a result of the injuries she sustained while attempting to unload from the Discovery Lift.[2] In her amended complaint Dr. Brigance alleged that the short distance between the ground and the Discovery Lift at the unloading point—coupled with the inadequate instruction provided by her ski instructor, the chairlift operator's failure to stop the lift, and VSRI's deficient hiring, training, and supervision of employees—caused her injuries. She consequently asserted the following six claims against VSRI: (1) negligence; (2) negligence per se; (3) negligent supervision and training; (4) negligence (respondeat superior); (5) negligent hiring; and (6) liability under the PLA.

VSRI moved to dismiss all claims raised by Dr. Brigance with the exception of her respondeat superior and PLA claims. The district court granted in part and denied in part VSRI's motion. *Brigance v. Vail Summit Resorts, Inc.* ("*Brigance I*"), No. 15-cv-1394-WJM-NYM, 2016 WL 931261, at *1–5 (D. Colo. Mar. 11, 2016). It dismissed Dr. Brigance's negligence claim as preempted by the PLA. *Id.* at *3–4. It also dismissed her negligence per se claim, concluding that she "fail[ed] to identify any requirement" of the Colorado Ski Safety Act of 1979 (the "SSA"), Colo. Rev. Stat. §§ 33-44-101 to -114, that VSRI had allegedly violated. *Brigance I*, 2016 WL

---

[2] The district court properly invoked diversity jurisdiction because Dr. Brigance is a citizen of Florida and VSRI is a Colorado corporation with its principal place of business in Colorado, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. §§ 1332(a), (c)(1)(B)–(C).

931261, at *2. In dismissing this claim, the district court also held that the provisions of the Passenger Tramway Safety Act (the "PTSA"), Colo. Rev. Stat. §§ 25-5-701 to -721, relied upon by Dr. Brigance "do[ ] not provide a statutory standard of care which is adequate to support [a] claim for negligence per se." *Brigance I*, 2016 WL 931261, at *2 (emphasis omitted). But the district court refused to dismiss Dr. Brigance's claims regarding negligent supervision and training and negligent hiring. *Id.* at *4–5.

Upon completion of discovery, VSRI moved for summary judgment on the basis that the Ski School Waiver and Lift Ticket Waiver completely bar Dr. Brigance's remaining claims. In the alternative, VSRI argued that summary judgment was appropriate because (1) Dr. Brigance failed to satisfy the elements of her PLA claim and (2) her common-law negligence claims are preempted by the PLA and otherwise lack evidentiary support. Dr. Brigance opposed the motion, contending in part that the waivers are unenforceable under the SSA and the four-factor test established by the Colorado Supreme Court in *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981). Dr. Brigance also asserted that her common-law negligence claims are not preempted by the PLA and that she presented sufficient evidence to allow her claims to be heard by a jury.

The district court granted VSRI's motion. *Brigance v. Vail Summit Resorts, Inc.* ("*Brigance II*"), No. 15-cv-1394-WJM-NYW, 2017 WL 131797, at *10 (D. Colo. Jan. 13, 2017). It determined that the Ski School Waiver and Lift Ticket Waiver are enforceable under the factors established by the Colorado Supreme Court

7

in *Jones* and that the SSA and PTSA do not otherwise invalidate the waivers. *Id.* at *5–9. It then determined that all of Dr. Brigance's remaining claims fall within the broad scope of the waivers and are therefore barred. *Id.* at *10. This appeal followed.

## II. DISCUSSION

Dr. Brigance challenges the district court's enforcement of both the Ski School Waiver and Lift Ticket Waiver, as well as the dismissal of her negligence and negligence per se claims. "[B]ecause the district court's jurisdiction was based on diversity of citizenship, [Colorado] substantive law governs" our analysis of the underlying claims and enforceability of the waivers. *Sylvia v. Wisler*, --- F.3d ---, 2017 WL 5622916, at *3 (10th Cir. 2017) (internal quotation marks omitted). We "must therefore ascertain and apply [Colorado] law with the objective that the result obtained in the federal court should be the result that would be reached in [a Colorado] court." *Id.* (internal quotation marks omitted). In doing so, "we must defer to the most recent decisions of the state's highest court," although "stare decisis requires that we be bound by our own interpretations of state law unless an intervening decision of the state's highest court has resolved the issue." *Id.* (internal quotation marks omitted).

Although the substantive law of Colorado governs our analysis of the waivers and underlying claims, federal law controls the appropriateness of a district court's grant of summary judgment and dismissal of claims under Federal Rule of Civil Procedure 12(b)(6). *See Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007). We therefore review the district court's grant of summary

8

judgment and dismissal of claims pursuant to Rule 12(b)(6) de novo, applying the same standards as the district court. *Id.*; *see also Sylvia*, 2017 WL 5622916, at \*4, 16. "However, we may affirm [the] district court's decision[s] on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Stickley*, 505 F.3d at 1076 (internal quotation marks omitted).

"Summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sylvia*, 2017 WL 5622916, at \*16 (internal quotation marks omitted). Because it is undisputed that all of Dr. Brigance's claims—including those dismissed pursuant to Rule 12(b)(6)—fall within the broad scope of either waiver if they are deemed enforceable under Colorado law, the first, and ultimately only, question we must address is whether the Ski School Waiver and Lift Ticket Waiver are enforceable.

Under Colorado law, "exculpatory agreements have long been disfavored," *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 136 (Colo. 1998), and it is well-established that such agreements cannot "shield against a claim for willful and wanton conduct, regardless of the circumstances or intent of the parties," *Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 726 (Colo. 2010). *See also Espinoza v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1152 (10th Cir. 2016) ("Under Colorado common law, it's long settled that courts will not give effect to contracts purporting to release claims for intentional, knowing, or reckless misconduct."). "But claims of negligence are a different matter. Colorado common law does not categorically prohibit the

9

enforcement of contracts seeking to release claims of negligence." *Espinoza*, 809 F.3d at 1152; *accord Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004). Neither does it always preclude exculpatory agreements as to claims of negligence per se. *Espinoza*, 809 F.3d at 1154–55.

Accordingly, the Colorado Supreme Court has instructed courts to consider the following four factors when determining the enforceability of an exculpatory agreement: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones*, 623 P.2d at 376. It appears that if an exculpatory agreement satisfies any of the four factors, it must be deemed unenforceable. Although consideration of these factors is generally sufficient to determine the enforceability of exculpatory agreements, the Colorado Supreme Court has clarified that "other public policy considerations" not necessarily encompassed in the *Jones* factors may invalidate exculpatory agreements. *See Boles*, 223 P.3d at 726 ("[M]ore recently, we have identified other public policy considerations invalidating exculpatory agreements, without regard to the *Jones* factors."); *see, e.g.*, *Cooper v. Aspen Skiing Co.*, 48 P.3d 1229, 1232–37 (Colo. 2002), *superseded by statute*, Colo. Rev. Stat. § 13-22-107.

The district court examined each of the *Jones* factors and concluded that none of them preclude enforcement of the Ski School Waiver or Lift Ticket Waiver. *Brigance II*, 2017 WL 131797, at *5–8. It also determined that the provisions of the

SSA and PTSA "have no effect on the enforceability" of the waivers. *Id.* at 9. We agree.

## A. The *Jones* Factors

### 1. *Existence of a Duty to the Public*

The first *Jones* factor requires us to examine whether there is an "existence of a duty to the public," *Jones*, 623 P.2d at 376, or, described another way, "whether the service provided involves a duty to the public," *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1109 (10th Cir. 2002). The Colorado Supreme Court has not specified the precise circumstances under which an exculpatory agreement will be barred under this factor, but it has explained that unenforceable exculpatory agreements

> generally involve businesses suitable for public regulation; that are engaged in performing a public service of great importance, or even of practical necessity; that offer a service that is generally available to any members of the public who seek it; and that possess a decisive advantage of bargaining strength, enabling them to confront the public with a standardized adhesion contract of exculpation.

*Chadwick*, 100 P.3d at 467. The Colorado Supreme Court has expressly "distinguished businesses engaged in recreational activities" from the foregoing class of businesses because recreational activities "are not practically necessary" and therefore "the provider[s of such activities] owe[ ] no special duty to the public." *Id.*; *see also Espinoza*, 809 F.3d at 1153 ("Though some businesses perform essential public services and owe special duties to the public, the [Colorado Supreme] [C]ourt has held that 'businesses engaged in recreational activities' generally do not." (quoting *Chadwick*, 100 P.3d at 467)).

11

And, indeed, Colorado courts examining exculpatory agreements involving recreational activities under Colorado law have almost uniformly concluded that the first *Jones* factor does not invalidate or render unenforceable the relevant agreement. *See, e.g.*, *Chadwick*, 100 P.3d at 467–69; *Jones*, 623 P.2d at 376–78; *Stone v. Life Time Fitness, Inc.*, No. 15CA0598, 2016 WL 7473806, at *3 (Colo. App. Dec. 29, 2016) (unpublished) ("The supreme court has specified that no public duty is implicated if a business provides recreational services."), *cert. denied*, No. 17SC82, 2017 WL 2772252 (Colo. Jun. 26, 2017); *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 949 (Colo. App. 2011) ("Our supreme court has held that businesses engaged in recreational activities that are not practically necessary, such as equine activities, do not perform services implicating a public duty."); *see also Espinoza*, 809 F.3d at 1153–56; *Mincin*, 308 F.3d at 1110–11; *Patterson v. Powdermonarch, L.L.C.*, No. 16-cv-00411-WYD-NYW, 2017 WL 4158487, at *5 (D. Colo. July 5, 2017) ("Businesses engaged in recreational activities like [defendant's ski services] have been held not to owe special duties to the public or to perform essential public services."); *Brooks v. Timberline Tours, Inc.*, 941 F. Supp. 959, 962 (D. Colo. 1996) ("Providing snowmobile tours to the public does not fall within" the first *Jones* factor.); *Lahey v. Covington*, 964 F. Supp. 1440, 1445 (D. Colo. 1996) (holding white-water rafting is recreational in nature and is therefore "neither a matter of great public importance nor a matter of practical necessity" (internal quotation marks omitted)), *aff'd sub nom.*, *Lahey v. Twin Lakes Expeditions, Inc.*, 113 F.3d 1246 (10th Cir. 1997).

The relevant services provided by VSRI—skiing and ski lessons—are clearly recreational in nature. Like horseback riding and skydiving services, *see Chadwick*, 100 P.3d at 467; *Jones*, 623 P.2d at 377, skiing and ski lessons are not of great public importance or "matter[s] of practical necessity for even some members of the public," *Jones*, 623 P.2d at 377. They therefore do not implicate the type of duty to the public contemplated in the first *Jones* factor. Although it appears the Colorado Supreme Court and Colorado Court of Appeals have yet to address the first *Jones* factor within the context of skiing or ski lesson services, the few courts that have considered similar issues have reached the unsurprising conclusion that ski-related services are recreational activities and do not involve a duty to the public. *See, e.g.*, *Rumpf v. Sunlight, Inc.*, No. 14-cv-03328-WYD-KLM, 2016 WL 4275386, at *3 (D. Colo. Aug. 3, 2016); *Potter v. Nat'l Handicapped Sports*, 849 F. Supp. 1407, 1409 (D. Colo. 1994); *Bauer v. Aspen Highlands Skiing Corp.*, 788 F. Supp. 472, 474 (D. Colo. 1992).

Dr. Brigance fails to address the principle "that businesses engaged in recreational activities that are not practically necessary . . . do not perform services implicating a public duty." *Hamill*, 262 P.3d at 949. Instead, she contends VSRI owes a duty to the public because the ski and ski lesson services provided by VSRI implicate a number of additional factors the California Supreme Court relied upon in *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 444–46 (Cal. 1963), to determine whether an exculpatory agreement should be deemed invalid as affecting public

13

interest.[3] Specifically, Dr. Brigance contends VSRI owes a duty to the public because the Colorado ski industry is subject to express regulation under the SSA and PTSA, VSRI is willing to perform its services for any member of the public who seeks them, VSRI maintains an advantage in bargaining strength, and skiers are placed under the complete control of VSRI when riding their lifts.

The Colorado Supreme Court has cited *Tunkl* and noted its relevance in determining whether a business owes a duty to the public. *Jones*, 623 P.2d at 376–77. But when analyzing the first *Jones* factor, particularly within the context of recreational services, courts applying Colorado law focus on and give greatest weight to whether the party seeking to enforce an exculpatory agreement is engaged in providing services that are of great public importance or practical necessity for at least some members of the public. *See, e.g.*, *Espinoza*, 809 F.3d at 1153–54; *Rowan v. Vail Holdings, Inc.*, 31 F. Supp. 2d 889, 896–97 (D. Colo. 1998); *Potter*, 849 F. Supp. at 1409; *Jones*, 623 P.2d at 376–77; *Stone*, 2016 WL 7473806, at *3; *Hamill*, 262 P.3d at 949. And the additional factors listed by Dr. Brigance are insufficient to establish that the recreational services offered by VSRI are of great public importance or practically necessary. An activity does not satisfy the first *Jones* factor simply because it is subject to state regulation. As we have explained, the first *Jones* factor does not

---

[3] Dr. Brigance separately argues that the waivers are invalid under the provisions and public policies contained within the SSA, PTSA, and PLA. Although she incorporates these arguments in her analysis of the first *Jones* factor, we address them separately in Section II.B, *infra*.

14

ask whether the activity in question is the subject of some sort of state regulation. Instead, [it] ask[s] whether the service provided is of "great importance to the public," a matter of "practical necessity" as opposed to (among other things) a "recreational one. [*Jones*,] 623 P.2d at 376–77. And the distinction the *Jones* factors draw between essential and recreational services would break down pretty quickly if the presence of some state regulation were enough to convert an otherwise obviously "recreational" service into a "practically necessary" one. After all, state law imposes various rules and regulations on service providers in most every field these days—including on service providers who operate in a variety of clearly recreational fields.

*Espinoza*, 809 F.3d at 1154; *see also Chadwick*, 100 P.3d at 467–68. Furthermore, Dr. Brigance's argument regarding VSRI's bargaining strength is more properly addressed under the third *Jones* factor, and her remaining arguments concerning VSRI's willingness to provide services to the public and its control over skiers are not sufficiently compelling to sway us from departing from the principle "that no public duty is implicated if a business provides recreational services." *Stone*, 2016 WL 7473806, at *3.

The district court therefore did not err in concluding that the first *Jones* factor does not render the Ski School Waiver and the Lift Ticket Waiver unenforceable.

2. *Nature of the Service Performed*

Under the second *Jones* factor, we examine "the nature of the service performed." *Jones*, 623 P.2d at 376. Analysis of this factor is linked to and in many respects overlaps the analysis conducted under the first *Jones* factor, as it calls for an examination of whether the service provided is an "essential service" or a "matter of practical necessity." *See Espinoza*, 809 F.3d at 1153; *Stone*, 2016 WL 7473806, at *3; *Hamill*, 262 P.3d at 949. As is evident from our discussion of the first *Jones*

15

factor, Colorado "courts have consistently deemed recreational services to be neither essential nor a matter of practical necessity." *Stone*, 2016 WL 7473806, at \*3; s*ee also Chadwick*, 100 P.3d at 467 (noting "recreational activities . . . are not practically necessary"); *Jones*, 623 P.2d at 377–78 (holding the skydiving service provided by defendants "was not an essential service"); *Hamill*, 262 P.3d at 949 (acknowledging recreational camping and horseback riding services are not essential or matters of practical necessity). And as previously established, the ski and ski lesson services offered by VSRI are recreational in nature and therefore, like other recreational activities examined by this and other courts, cannot be deemed essential or of practical necessity. *See, e.g.*, *Mincin*, 308 F.3d at 1111 ("[M]ountain biking is not an essential activity."); *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1062, 1073 (D. Colo. 2011) (noting the parties did not dispute that skiing "is a recreational service, not an essential service"); *Rowan*, 31 F. Supp. 2d at 897 ("[S]kiing is not an essential service."); *Potter*, 849 F. Supp. at 1410 (disagreeing with plaintiff's argument that "ski racing for handicapped skiers rises to the level of an essential service [as] contemplated by Colorado law"); *Bauer*, 788 F. Supp. at 474 (noting "free skiing[, equipment rentals, and ski lessons] for travel agents do[ ] not rise to the level of essential service[s] contemplated by Colorado law.").

Dr. Brigance raises no argument specific to this factor other than asserting that "the ski industry is a significant revenue generator for the State of Colorado" and the services provided by VSRI are "public [in] nature." Aplt. Br. 47. Dr. Brigance cites no authority suggesting that either factor would render the recreational services

16

provided by VSRI essential in nature. And given Colorado courts' assertion that "recreational services [are] neither essential nor . . . matter[s] of practical necessity," *Stone*, 2016 WL 7473806, at *3, we conclude the district court did not err in determining that the second *Jones* factor also does not dictate that the waivers be deemed unenforceable.

### 3. Whether the Waivers Were Fairly Entered Into

The third *Jones* factor requires us to examine "whether the contract was fairly entered into." *Jones*, 623 P.2d at 376. "A contract is fairly entered into if one party is not so obviously disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence." *Hamill*, 262 P.3d at 949 (citing *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo. 1989)). When engaging in this analysis, we examine the nature of the service involved, *Espinoza*, 809 F.3d at 1156, the circumstances surrounding the formation of the contract, *id.*, and whether the services provided are available from a source other than the party with which the plaintiff contracted, *see Stone*, 2016 WL 7473806, at *3; *Hamill*, 262 P.3d at 950.

The Colorado Court of Appeals has identified "[p]ossible examples of unfair disparity in bargaining power [as] includ[ing] agreements between employers and employees and between common carriers or public utilities and members of the public." *Stone*, 2016 WL 7473806, at *3. It has also expressly acknowledged an unfair disparity in bargaining power in residential landlord-tenant relationships, presumably based in part on its holding "that housing rental is a matter of practical

17

necessity to the public." *Stanley v. Creighton Co.*, 911 P.2d 705, 708 (Colo. App. 1996). But the Colorado Court of Appeals has also held that "this type of unfair disparity is generally not implicated when a person contracts with a business providing recreational services." *Stone*, 2016 WL 7473806, at *3. This is because recreational activities are not essential services or practically necessary, and therefore a person is not "at the mercy" of a business's negligence when entering an exculpatory agreement involving recreational activities. *Hamill*, 262 P.3d at 949–50. As we have previously explained, "Colorado courts have repeatedly emphasized that . . . because recreational businesses do not provide 'essential' services of 'practical necessity[,]' individuals are generally free to walk away if they do not wish to assume the risks described" in an exculpatory agreement. *Espinoza*, 809 F.3d at 1157; *see also Mincin*, 308 F.3d at 1111 (noting that a disparity of bargaining power may be created by the "practical necessity" of a service, but that no such necessity existed because "mountain biking is not an essential activity" and therefore the plaintiff "did not enter into the contract from an inferior bargaining position").

We reiterate, at the risk of redundancy, that the ski and ski lesson services offered by VSRI are recreational in nature and do not constitute essential services or matters of practical necessity. As a result, Dr. Brigance did not enter the Ski School Waiver or Lift Ticket Waiver from an unfair bargaining position because she was free to walk away if she did not wish to assume the risks or waive the right to bring certain claims as described in the waivers. This conclusion is supported by a number of cases involving similar recreational activities, including those we have previously

18

addressed under the first two *Jones* factors. *See*, *Jones*, 623 P.2d at 377–78 (holding an exculpatory release related to skydiving services was not an unenforceable adhesion contract "because the service provided . . . was not an essential service" and therefore the defendant "did not possess a decisive advantage of bargaining strength over" the plaintiff); *see also Squires*, 829 F. Supp. 2d at 1071 ("Where, as here, the service provided is a recreational service and not an essential service, there is no unfair bargaining advantage."); *Day v. Snowmass Stables, Inc.*, 810 F. Supp. 289, 294 (D. Colo. 1993) ("[T]he recreational services offered by [defendant] were not essential and, therefore, [it] did not enjoy an unfair bargaining advantage."); *Bauer*, 788 F. Supp. at 475 ("Here, defendants' recreational services were not essential and, therefore, they did not enjoy an unfair bargaining advantage.").

Moreover, the circumstances surrounding Dr. Brigance's entry into the exculpatory agreements indicate she did so fairly. Dr. Brigance does not identify any evidence in the record calling into question her competency, ability to comprehend the terms of the agreements, or actual understanding of the agreements. Nor does she point to anything in the record reflecting an intent or attempt by VSRI to fraudulently induce her to enter the agreements or to conceal or misconstrue their contents. In addition, there is nothing in the record to suggest Dr. Brigance's agreement to the terms of the Ski School Waiver was not voluntary. *See Brigance II*, 2017 WL 131797, at *3–4.

Notwithstanding the well-established law that exculpatory agreements involving businesses providing recreational services do not implicate the third *Jones*

19

factor, Dr. Brigance argues her assent to the terms of the Lift Ticket Waiver was obtained unfairly and that VSRI had an advantage in bargaining strength. This is so, she contends, because she "did not have a chance to review the exculpatory language contained on the back of the non-refundable [lift] ticket before she purchased it" and that "[o]nce the ticket was purchased, she was forced to accept the exculpatory language or lose the money she invested." Aplt. Br. 47. Dr. Brigance's argument fails to account for her voluntary acceptance of the Ski School Waiver. And although Dr. Brigance asserts she "did not have a chance to review" the Lift Ticket Waiver before purchasing it, she does not identify any evidence that VSRI prevented her from reviewing the Lift Ticket Waiver before she used it to ride the Discovery Lift, and "Colorado courts have repeatedly emphasized that individuals engaged in recreational activities are generally expected to read materials like these." *Espinoza*, 809 F.3d at 1157. Most importantly, Dr. Brigance did not raise this argument below and does not provide a compelling reason for us to address it on appeal.[4] *See Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994) ("Absent compelling reasons, we do not consider arguments that were not presented to the district court.").

---

[4] In fact, the district court noted that Dr. Brigance "neither disputes the relevant facts nor counters VSRI's argument that she accepted the contractual terms of the Lift Ticket Waiver by skiing and riding the lifts." *Brigance II*, 2017 WL 131797, at *4. As a result, the district court concluded Dr. Brigance had agreed to the terms of the Lift Ticket Waiver and would be bound to its terms to the extent it was otherwise enforceable. *Id.*

For these reasons, the district court did not err in concluding that the third *Jones* factor does not render the Ski School Waiver or the Lift Ticket Waiver unenforceable.

### 4. *Whether the Parties' Intent Was Expressed Clearly and Unambiguously*

The fourth and final *Jones* factor is "whether the intention of the parties is expressed in clear and unambiguous language." *Jones*, 623 P.2d at 376. The inquiry conducted under this factor "should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Heil Valley Ranch*, 784 P.2d at 785. The Colorado Supreme Court has explained that "[t]o determine whether the intent of the parties is clearly and unambiguously expressed, we [may] examine[ ] the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions." *Chadwick*, 100 P.3d at 467. We may also take into account a party's subsequent acknowledgement that it understood the provisions of the agreement. *Id.* In addition, it is well-established that the term "negligence" is not invariably required for an exculpatory agreement to be deemed an unambiguous waiver or release of claims arising from negligent conduct. *Id.*

The Ski School Waiver contains approximately a page and a half of terms and conditions in small, but not unreadable, font.[5] It prominently identifies itself as, among other things, a "RELEASE OF LIABILITY . . . AGREEMENT"—a fact that is reiterated in the subtitle of the agreement by inclusion of the statement "**THIS IS A RELEASE OF LIABILITY & WAIVER OF CERTAIN LEGAL RIGHTS**." Aplt. App'x 117. The provisions of the waiver include the signer's express acknowledgment and assumption of "**ALL INHERENT DANGERS AND RISKS** of the Activity, including those of a 'skier' (as may be identified by statute or other applicable law)," as well as "**all additional risks and dangers that may result in . . . physical injury and/or death above and beyond the inherent dangers and risks of the Activity, including but not limited to**" a lengthy list of specific events and circumstances that includes "lift loading, unloading, and riding." *Id.* In addition to this assumption-of-the-risk language, the Ski School Waiver provides that the signer

> **AGREE[S] TO HOLD HARMLESS, RELEASE, INDEMNIFY, AND NOT TO SUE [VSRI] FOR ANY . . . INJURY OR LOSS TO PARTICIPANT, INCLUDING DEATH, WHICH PARTICIPANT MAY SUFFER, ARISING IN WHOLE OR IN PART OUT OF PARTICIPANT'S PARTICIPATION IN THE ACTIVITY, INCLUDING, BUT NOT LIMITED TO, THOSE CLAIMS BASED ON ANY RELEASED PARTY'S ALLEGED OR ACTUAL NEGLIGENCE OR BREACH OF ANY CONTRACT AND/OR EXPRESS OR IMPLIED WARRANTY**.

---

[5] Although Dr. Brigance denies that she signed the Ski School Waiver, *see supra* note 1, she has not made any arguments regarding the readability or font size of the terms and conditions.

22

*Id.*

The Lift Ticket Waiver—approximately two paragraphs in length—is not as detailed as the Ski School Waiver, but contains somewhat similar language regarding the ticket holder's assumption of risk and waiver of claims. After detailing some of the inherent dangers and risks of skiing that the holder of the ticket assumes, as well as identifying other risks and responsibilities, the Lift Ticket Waiver provides that the "Holder agrees to **ASSUME ALL RISKS**, inherent or otherwise" and "to hold the ski area harmless for claims to person and property." *Id.* at 121.

Neither waiver is unduly long nor complicated, unreadable, or overburdened with legal jargon. Most importantly, the intent of the waivers is clear and unambiguous. In addition to the language indicating Dr. Brigance's assumption of all risks of skiing, inherent or otherwise, both waivers contain clear language stating that Dr. Brigance agreed to hold VSRI harmless for injuries to her person as a result of skiing at Keystone. Moreover, the Ski School Waiver clearly and unambiguously provides that Dr. Brigance agreed to "**RELEASE, INDEMNIFY, AND NOT TO SUE**" VSRI for personal injuries arising in whole or in part from her participation in ski lessons, including claims based on VSRI's "**ALLEGED OR ACTUAL NEGLIGENCE**." *Id.* at 117. Dr. Brigance does not argue that any of the language regarding her agreement to hold harmless, indemnify, release, or not to sue VSRI is ambiguous or confusing. And like this and other courts' examination of similarly worded provisions, we conclude the relevant release language of the Ski School Waiver and Lift Ticket Waiver cannot be reasonably understood as expressing

23

anything other than an intent to release or bar suit against VSRI from claims arising, in whole or in part, as a result of Dr. Brigance's decision to ski and participate in ski lessons at Keystone, including claims based on VSRI's negligence. *See Espinoza*, 809 F.3d at 1157–58; *Mincin*, 308 F.3d at 1112–13; *Chadwick*, 100 P.3d at 468–69; *B & B Livery*, 960 P.2d at 137–38; *Hamill*, 262 P.3d at 950–51.

Dr. Brigance's argument on appeal regarding the fourth *Jones* factor centers on the assumption-of-the-risk language contained in both waivers. Specifically, Dr. Brigance contends the intent of the waivers is ambiguous because the provisions providing that she assumes all risks of skiing, "inherent or otherwise," conflict with the SSA because the statute's provisions only bar a skier from recovering against a ski area operator "for injury resulting from any of the inherent dangers and risks of skiing." Colo. Rev. Stat. § 33-44-112; *see also id.* at 33-44-103(3.5). Because of this alleged conflict, Dr. Brigance asserts that she could not know whether she was "releasing [VSRI] of all liability as indicated by the [waivers], or only for the inherent risks of skiing as mandated by the SSA." Aplt. Br. 50–51.

Dr. Brigance's argument is unavailing for a number of reasons. First, it only addresses the assumption-of-the-risk language contained in each waiver. But the more pertinent provisions of the waivers are those regarding Dr. Brigance's agreement to hold harmless, release, indemnify, and not to sue VSRI. These provisions appear independent from the assumption-of-the-risk language and therefore their plain meaning is unaffected by any potential ambiguity in the "inherent or otherwise" clauses. Dr. Brigance does not contest the clarity of the

24

release provisions and, as previously described, we believe those provisions unambiguously reflect the parties' intent to release VSRI from claims arising from Dr. Brigance's participation in ski lessons at Keystone.

Second, the Lift Ticket Waiver's "assumes all risks, inherent or otherwise" phrase, as well as a similar phrase contained in the Ski School Waiver, are not ambiguous. Rather, their meanings are clear—the signer of the agreement or holder of the ticket is to assume all risks of skiing, whether inherent to skiing or not. The term "otherwise," when "paired with an adjective or adverb to indicate its contrary"—as is done in both waivers—is best understood to mean "NOT." Webster's Third New Int'l Dictionary 1598 (2002). The plain language and meaning of the phrases therefore reflect a clear intent to cover risks that are not inherent to skiing. Dr. Brigance offers no alternative reading of the phrases and does not specify how "inherent or otherwise" could be understood as only referring to the inherent risks identified in the SSA. And while the Ski School Waiver contains a provision in which the signer agrees to assume all inherent dangers and risks of skiing as may be defined by statute or other applicable law, the next provision of the agreement clearly expands that assumption of risk, stating that the signer "**expressly acknowledge[s] and assume[s] all additional risks and dangers that may result in . . . physical injury and/or death <u>above and beyond</u> the inherent dangers and risks of the Activity, <u>including but not limited to</u>**" a rather extensive list of circumstances or events that may occur while skiing, including "lift loading, unloading, and riding." Aplt. App'x at 117. That same provision continues, indicating that the signer

25

understands the description of risks in the agreement is "**NOT COMPLETE**," but that the signer nevertheless voluntarily chooses to "**EXPRESSLY ASSUME ALL RISKS AND DANGERS OF THE ACTIVITY, WHETHER OR NOT DESCRIBED HERE, KNOWN OR UNKNOWN, INHERENT OR OTHERWISE**." *Id.* Reading the "inherent or otherwise" phrase in context clearly indicates that, at a minimum, the Ski School Waiver includes an assumption of risk above and beyond the inherent risks and dangers of skiing as defined in the SSA. *See Ringquist v. Wall Custom Homes, LLC*, 176 P.3d 846, 849 (Colo. App. 2007) ("In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions."); *Moland v. Indus. Claim Appeals Office of State*, 111 P.3d 507, 510 (Colo. App. 2004) ("The meaning and effect of a contract is to be determined from a review of the entire instrument, not merely from isolated clauses or phrases.").

Third, the Colorado Supreme Court rejected a similar argument in *B & B Livery, Inc. v. Riehl*, 960 P.2d 134 (Colo. 1998). There, the Colorado Supreme Court examined an exculpatory agreement that included a statutorily mandated warning that equine professionals are not liable to others for the inherent risks associated with participating in equine activities, "as well as a broader clause limiting liability from non-inherent risks." *Id.* at 137–38. It concluded that "the insertion of a broader clause further limiting liability does not make the agreement ambiguous per se" and instead

26

"merely evinces an intent to extinguish liability above and beyond that provided" in the statute. *Id.* at 137; *see also Hamill*, 262 P.3d at 951 (upholding enforcement of an exculpatory agreement that purported to cover "inherent and *other risks*," as well as claims against "*any legal liability*," and noting that "[t]o hold . . . that the release did not provide greater protection than the release from liability of inherent risks provided by the equine act . . . would render large portions of the agreement meaningless"). Furthermore, the waivers do not conflict with the SSA merely because they purport to cover a broader range of risks than those identified by the statute as inherent to skiing. *See Fullick v. Breckenridge Ski Corp.*, No. 90-1377, 1992 WL 95421, at *3 (10th Cir. Apr. 29, 1992) (unpublished) ("If one could never release liability to a greater degree than a release provided in a statute, then one would never need to draft a release, in any context."); *Chadwick*, 100 P.3d at 468 ("[T]his court has made clear that parties may, consistent with the [equine] statute, contract separately to release sponsors even from negligent conduct, as long as the intent of the parties is clearly expressed in the contract.").

Finally, the single case relied upon by Dr. Brigance that applies Colorado law is distinguishable. In *Rowan v. Vail Holdings, Inc.*, 31 F. Supp. 2d 889, 899–900 (D. Colo. 1998), the district court determined an exculpatory agreement was ambiguous and therefore unenforceable in part because it first recited "the risks being assumed in the broadest possible language," expressly including risks associated with the use of ski lifts, and then later addressed the assumption of risk in terms of the inherent risks and dangers of skiing as defined in the SSA, which indicates the use of ski lifts

27

does not fall within its definition of inherent risks. The release therefore conflicted with itself and the relevant statutory language. *See Cunningham v. Jackson Hole Mountain Resort Corp.*, 673 F. App'x 841, 847 (10th Cir. Dec. 20, 2016) (unpublished). But unlike the waiver at issue in *Rowan*, the Ski School Waiver and Lift Ticket Waiver do not define the inherent risks of skiing in a manner contrary to the SSA. Nor do they contain conflicting provisions. The non-exhaustive list of inherent risks identified in the Lift Ticket Waiver appears to be drawn directly from the SSA, while the Ski School Waiver indicates inherent risks include those "as may be defined by statute or other applicable law." Aplt. App'x at 117, 121. In addition, after referencing the inherent risks of skiing and providing that the signer of the agreement assumes those risks, the Ski School Waiver goes on to identify other, non-inherent risks associated with skiing and ski lessons and expressly provides that the signer assumes those risks. Specifically, the waiver makes clear that the risks assumed by Dr. Brigance include "**all additional risks and dangers . . . <u>above and beyond</u> the inherent dangers and risks**" of skiing and ski lessons, whether described in the waiver or not, known or unknown, or inherent or otherwise. *Id.* at 117. Unlike the provisions at issue in *Rowan* that provided conflicting statements regarding the risks assumed, the waivers here unambiguously provide that Dr. Brigance agreed to not only assume risks and dangers inherent to skiing, but also those risks and dangers not inherent to skiing.

Accordingly, the district court did not err in concluding that the fourth *Jones* factor does not invalidate the waivers.

28

***

Based on the foregoing analysis, we agree with the district court that application of the *Jones* factors to the Ski School Waiver and Lift Ticket Waiver do not render them unenforceable.

## B. The SSA and PTSA

Although analysis of the *Jones* factors is often sufficient to determine the validity of an exculpatory agreement, the Colorado Supreme Court has "identified other public policy considerations invalidating exculpatory agreements, without regard to the *Jones* factors." *Boles*, 223 P.3d at 726. At various points on appeal, either as standalone arguments or embedded within her analysis of the *Jones* factors, Dr. Brigance contends the Ski School Waiver and the Lift Ticket Waiver are unenforceable as contrary to Colorado public policy because they conflict with the SSA, PTSA, and the public policies announced therein.[6] The district court considered these arguments and determined that the statutes do not affect the enforceability of either waiver as to Dr. Brigance's claims. We find no reason to disagree.

---

[6] Dr. Brigance also argues that the PLA prohibits use of exculpatory agreements as a defense to claims raised under its provisions and that the Ski School Waiver and Lift Ticket Waiver conflict with the public policies set forth in its provisions. But Dr. Brigance forfeited these arguments by failing to raise them in the district court. *Avenue Capital Mgmt. II*, 843 F.3d at 884. Although we may consider forfeited arguments under a plain-error standard, we decline to do so when, as here, the appellant fails to argue plain error on appeal. *Id.* at 885; see also *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011). We decline to address Dr. Brigance's argument that the waivers are unenforceable because their language is broad enough to encompass willful and wanton behavior for the same reason.

29

In 1965, the Colorado General Assembly enacted the PTSA with the purpose of assisting "in safeguarding life, health, property, and the welfare of the state in the operation of passenger tramways." *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 73 (Colo. 1998). The PTSA provides that "it is the policy of the state of Colorado to establish a board empowered to prevent unnecessary mechanical hazards in the operation of passenger tramways" and to assure that reasonable design and construction, periodic inspections, and adequate devices and personnel are provided with respect to passenger tramways. Colo. Rev. Stat. § 25-5-701. The General Assembly empowered the board "with rulemaking and enforcement authority to carry out its functions," including the authority to "conduct investigations and inspections" and "discipline ski area operators." *Bayer*, 960 P.2d at 73–74; *see also* Colo. Rev. Stat. §§ 25-5-703 to -704, -706 to -707. With its authority, the board adopted the standards, with some alterations, utilized by the American National Standards Institute for passenger tramways. *Bayer*, 960 P.2d at 73–74.

The General Assembly enacted the SSA fourteen years later. The SSA "supplements the [PTSA]'s focus on ski lifts, but its principal function is to define the duties of ski areas and skiers with regard to activities and features on the ski slopes." *Id.* at 74. The provisions of the SSA indicate that "it is in the interest of the state of Colorado to establish reasonable safety standards for the operation of ski areas and for the skiers using them" and that the SSA's purpose is to supplement a portion of the PTSA by "further defin[ing] the legal responsibilities of ski area operators . . . and . . . the rights and liabilities existing between the skier and the ski

30

area operator." Colo. Rev. Stat. § 33-44-102. In addition to the SSA's provisions defining various responsibilities and duties of skiers and ski area operators, the 1990 amendments to the SSA limited the liability of ski area operators by providing that "no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing." *Id.* at 33-44-112. The SSA also provides that any violation of its provisions applicable to skiers constitutes negligence on the part of the skier, while "[a] violation by a ski area operator of any requirement of [the SSA] or any rule or regulation promulgated by the passenger tramway safety board . . . shall . . . constitute negligence on the part of such operator." *Id.* at 33-44-104. "The effect of these statutory provisions is to make violations of the [SSA] and [the rules and regulations promulgated by passenger tramway safety board] negligence *per se*." *Bayer*, 960 P.2d at 74. Ultimately, the SSA and PTSA together "provide a comprehensive . . . framework which preserves ski lift common law negligence actions, while at the same time limiting skier suits for inherent dangers on the slopes and defining *per se* negligence for violation of statutory and regulatory requirements." *Id.* at 75.

Dr. Brigance contends the waivers conflict with the public policy objectives of the SSA and PTSA because enforcing either waiver would allow VSRI to disregard its statutorily defined responsibilities and duties. We find Dr. Brigance's argument unpersuasive.

At the outset, it is worth reiterating that under Colorado law exculpatory agreements are not invalid as contrary to public policy simply because they involve

31

an activity subject to state regulation. *Espinoza*, 308 F.3d at 1154; *see also id.* at 1155 (acknowledging the Colorado Supreme Court has allowed enforcement of exculpatory agreements with respect to equine activities despite the existence of a statute limiting liability for equine professionals in certain circumstances, while still allowing for liability in other circumstances); *Mincin*, 308 F.3d at 1111 ("The fact that the Colorado legislature has limited landowner liability in the contexts of horseback riding and skiing is relevant to the question of whether landowner liability might be limited in other circumstances *absent a contract*."). Similarly, exculpatory agreements do not conflict with Colorado public policy merely because they release liability to a greater extent than a release provided in a statute. *See Fullick*, 1992 WL 95421, at *3; *Chadwick*, 100 P.3d at 468; *B & B Livery*, 960 P.2d at 137–38.

It is true that the SSA and PTSA identify various duties and responsibilities that, if violated, may subject a ski area operator to liability. But the acts establish a framework preserving common law negligence actions in the ski and ski lift context, *Bayer*, 960 P.2d at 75, and do nothing to expressly or implicitly preclude private parties from contractually releasing potential common law negligence claims through use of an exculpatory agreement. While "a statute . . . need not explicitly bar waiver by contract for the contract provision to be invalid because it is contrary to public policy," *Stanley v. Creighton Co.*, 911 P.2d 705, 707 (Colo. App. 1996), Dr. Brigance does not identify a single provision in either the SSA or PTSA suggesting the enforcement of exculpatory agreements in the ski and ski lift context is impermissible or contrary to public policy. Moreover, "Colorado law has long permitted parties to

32

contract away negligence claims in the recreational context" and we "generally will not assume that the General Assembly mean[t] to displace background common law principles absent some clear legislative expression of that intent." *Espinoza*, 809 F.3d at 1154, 1155. This principle is particularly relevant in the context of exculpatory agreements because "[t]he General Assembly . . . has shown that—when it wishes—it well knows how to displace background common law norms and preclude the release of civil claims." *Espinoza*, 809 F.3d at 1154–55.

Our conclusion that the SSA and PTSA do not bar exculpatory agreements is supported by the Colorado Supreme Court's regular enforcement of exculpatory agreements involving recreational activities, particularly in the context of equine activities, as well as the General Assembly's relatively recent pronouncements regarding the public policy considerations involved in a parent's ability to execute exculpatory agreements on behalf of its child with respect to prospective negligence claims. In 2002, the Colorado Supreme Court concluded that Colorado public policy prohibits a parent or guardian from releasing a minor's prospective claims for negligence. *See Cooper*, 48 P.3d at 1237. The Colorado Supreme Court's broad holding appeared to apply even within the context of recreational activities, as the relevant minor had injured himself while skiing. *Id.* at 1231–35. The following year, the General Assembly enacted Colo. Rev. Stat. § 13-22-107, which expressly declared that the General Assembly would not adopt the Colorado Supreme Court's holding in *Cooper*. Colo. Rev. Stat. § 13-22-107(1)(b). Instead, the General Assembly explained that, among other things, it is the public policy of Colorado that

"[c]hildren . . . should have the maximum opportunity to participate in sporting, recreational, educational, and other activities where certain risks may exist" and that "[p]ublic, private, and non-profit entities providing these essential activities to children in Colorado need a measure of protection against lawsuits." *Id.* at 13-22-107(1)(a)(I)-(II). Accordingly, the General Assembly established that "[a] parent of a child may, on behalf of the child, release or waive the child's prospective claim for negligence." *Id.* at 13-22-107(3). The General Assembly's enactment of § 33-22-107 reaffirms Colorado's permissive position on the use of exculpatory agreements in the recreational context, and its authorization of parental releases and waivers suggests it did not intend and would not interpret the SSA as barring such agreements for adults.

Notwithstanding the lack of any statutory suggestion that the SSA and PTSA prohibit the enforcement of exculpatory agreements as a matter of public policy, Dr. Brigance contends two Colorado Court of Appeals decisions support her assertion to the contrary. In *Stanley v. Creighton*, the Colorado Court of Appeals analyzed an exculpatory clause in a residential rental agreement under the *Jones* factors and concluded that the agreement involved a public interest sufficient to invalidate the exculpatory clause. 911 P.2d at 707–08. The *Stanley* court reached this conclusion because, among other things, Colorado has long regulated the relationship between landlords and tenants, the PLA "confirms that landowner negligence is an issue of public concern," and "a landlord's services are generally held out to the public and . . . housing rental is a matter of practical necessity to the public." *Id.* Although the *Stanley* court's partial reliance on the existence of state regulations tends to support

34

Dr. Brigance's assertion that the existence of the SSA and PTSA render the Ski School Wavier and Lift Ticket Waiver either contrary to public policy or sufficient to satisfy the first *Jones* factor, the circumstances here are readily distinguishable. Unlike residential housing, skiing is not essential nor a matter of practical necessity. Among other considerations not present here, the *Stanley* court "placed greater emphasis on the *essential* nature of residential housing" and "alluded to a distinction between residential and commercial leases, implying that an exculpatory clause might well be valid in the context of a commercial lease." *Mincin*, 308 F.3d at 1110.

Similarly, Dr. Brigance's reliance on *Phillips v. Monarch Recreation Corp.*, 668 P.2d 982 (Colo. App. 1983), does not alter our conclusion. In *Phillips*, the Colorado Court of Appeals stated that "[s]tatutory provisions may not be modified by private agreement if doing so would violate the public policy expressed in the statute." *Id.* at 987. Applying this principle, the *Phillips* court concluded that because the SSA "allocate[s] the parties' respective duties with regard to the safety of those around them, . . . the trial court correctly excluded a purported [exculpatory] agreement intended to alter those duties." *Id.* But apparently unlike the agreement at issue in *Phillips*, the Ski School Waiver and Lift Ticket Waiver do not appear to alter the duties placed upon VSRI under the SSA. *See*, *Fullick*, 1992 WL 95421, at *3. And the court's application of this principle to the SSA appears to be inconsistent with the more recent pronouncements by the Colorado Supreme Court and General Assembly regarding Colorado policies toward the enforceability of exculpatory

35

agreements in the context of recreational activities. Moreover, as detailed above, the SSA and PTSA do not express a policy against exculpatory agreements.

"Given all this," particularly the SSA's and PTSA's silence with respect to exculpatory agreements, "we do not think it our place to adorn the General Assembly's handiwork with revisions to the [SSA, PTSA, and] common law that it easily could have but declined to undertake for itself." *Espinoza*, 809 F.3d at 1155.

In summary, Colorado's "relatively permissive public policy toward recreational releases" is one "that, no doubt, means some losses go uncompensated." *Espinoza*, 809 F.3d at 1153. And the Colorado Supreme Court and General Assembly may someday "prefer a policy that shifts the burden of loss to the service provider, ensuring compensation in cases like this." *Id.* But "that decision is their decision to make, not ours, and their current policy is clear." *Id.* As a result, for the reasons stated above, we conclude the Ski School Waiver and Lift Ticket Waiver are enforceable and accordingly bar Dr. Brigance's claims.

### III.    CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of VSRI and, on this alternative basis, its partial grant of VSRI's motion to dismiss.