FILED
United States Court of Appeals
Tenth Circuit

May 8, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CAROLYN S. RAUP,

      Plaintiff - Appellant,

v.

VAIL SUMMIT RESORTS, INC.,

      Defendant - Appellee.

------------------------------

COLORADO TRIAL LAWYERS
ASSOCIATION,

      Amicus Curiae.

No. 17-1039
(D.C. No. 1:15-CV-00641-WYD-NYW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **HARTZ**, and **BACHARACH**, Circuit Judges.
_____

Carolyn Raup was badly injured upon dismounting a chairlift operated by Vail

Summit Resorts, Inc. She sued Vail in the United States District Court for the District of

Colorado under diversity jurisdiction, *see* 28 U.S.C. § 1332, asserting a negligence claim

and a claim under Colorado's Premises Liability Act (PLA), Colo. Rev. Stat. § 13-21-

115. The district court dismissed the negligence claim as preempted by the PLA and

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

granted summary judgment to Vail on the PLA claim as barred by a waiver on the lift ticket. Raup appeals only the dismissal of the PLA claim, asserting that the waiver was unenforceable. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Under Colorado's common-law test for waiver enforceability, the release was "fairly entered into" and "expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). And the PLA does not preempt the common-law defense.

## I. BACKGROUND

Vail operates the "Fun Park" in Breckenridge, Colorado. The park's "Colorado SuperChair" provides chairlift rides. Raup visited the Fun Park in June 2013 with Elizabeth Raup (her daughter) and Jason Pyle (Elizabeth's husband). Elizabeth and Pyle bought Raup a SuperChair ticket.

The bottom of the ticket's face states, "IMPORTANT WARNING ON REVERSE." Fed. R. App. P. 28(j) Notice of Supplemental Authority Ex. 1 (Oct. 2, 2017) (referred to hereafter as "Lift Ticket"). On the top of the backside is printed, "WARNING," followed by several bullet points purporting to limit Vail's liability for ticketholder injuries:

- The Holder of this ticket understands and VOLUNTARILY ASSUMES ALL RISKS associated with visiting the Fun Park, including the risks of property damage, personal injury, and death.

- The Holder agrees to not bring any claim or lawsuit against the Fun Park or its affiliates that could arise from the negligence of the Holder or others, including the negligence of the Fun Park operator or its employees, or from incidents occurring in connection with the natural environment or reasons outside the

2

Fun Park's or its affiliates' control.

- The Holder understands that many activities in the Fun Park are self-directed, and that property damage, injury or death to Holder or others may occur as a result of the Holder's own decisions and actions in these activities.

. . .

- The Fun Park and its affiliates affirmatively deny all liability for any property damage, injury, or death occurring as a result of or related to the Holder's visit to the Fun Park, and the Holder, by use of this ticket, hereby understands and accepts such denial of liability and agrees to hold harmless and indemnify the Fun Park and its affiliates for any claim or lawsuit that may arise as a result of or related to the Holder's visit.

*Id.* The bottom of the ticket's back states, "NOT TRANSFERABLE — NO REFUNDS — NOT REPLACEABLE — CAN NOT BE RESOLD." *Id.*

After the ticket purchase Raup, Elizabeth, and Pyle boarded the SuperChair. At the summit, staff allegedly told Raup to prepare to get off the chair well beyond the point where they should have. She claims that she tried to comply, but stumbled when she hopped off the chair and was hit by the chair from behind. She was knocked off the platform and severely injured her leg and ankle. To recover damages for her injuries, she sued Vail.

## II.    ANALYSIS

"We review summary judgments de novo, applying the same standards that the district court should apply." *United States v. Turley*, 878 F.3d 953, 956 (10th Cir. 2017). There is no dispute that the law of Colorado governs this litigation. Raup contends that

3

the waiver of liability on the ticket is unenforceable for three reasons: (1) the waiver does not satisfy the common-law requirements for waiver of liability established in *Jones*, (2) the PLA provides the exclusive grounds for assessing liability and does not recognize a waiver defense, and (3) the waiver is contrary to public policy established by the PLA. Because this is a diversity case, our task is to predict how Colorado's highest court would resolve Raup's three contentions. *See Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1250 (10th Cir. 2010). For the following reasons, we believe that the court would reject them all.

## A. *Jones* Factors

Raup argues that the lift-ticket waiver is unenforceable under the test set forth by the Supreme Court of Colorado in *Jones*, 623 P.2d 370. *Jones* said that exculpatory agreements releasing a party from liability for negligence are permissible but "must be closely scrutinized." *Id.* at 376. To assess a release's enforceability, courts consider four factors: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Id.* This court has recently noted that a waiver must satisfy all four factors to be enforceable. *See Brigance v. Vail Summit Resorts, Inc.*, 883 F.3d 1243, 1250 (10th Cir. 2018).

In district court Raup explicitly abandoned any arguments based on the first two *Jones* factors. This concession was probably sound. *See Espinoza v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1153 (10th Cir. 2016) ("Though some businesses perform essential public services and owe special duties to the public, the [Colorado

4

Supreme Court] has held that businesses engaged in recreational activities generally do not." (internal quotation marks omitted)); *Brigance*, 883 F.3d at 1250–53.[1]

The third *Jones* factor is "whether the [exculpatory] contract was fairly entered into." *Jones*, 623 P.2d at 376. We recently explicated this factor in the context of another chairlift accident: An exculpatory "contract is fairly entered into if one party is not so obviously disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence." *Brigance*, 883 F.3d at 1253 (internal quotation marks omitted). "When engaging in this analysis, we examine the nature of the service involved, the circumstances surrounding the formation of the contract, and whether the services provided are available from a source other than the party with which the plaintiff contracted." *Id.* (citations omitted). Although Colorado courts have indicated that there may be unfair disparity in bargaining power in an employee-employer or residential landlord-tenant relationship, or when a member of the public obtains service from a common carrier or public utility, they have "held that this type of unfair disparity is generally not implicated when a person contracts with a business providing recreational services. This is because recreational activities are not essential services or practically necessary, and therefore a person is not at the mercy of a business's negligence . . . ." *Id.* (citation and internal quotation marks omitted). In

---

[1] Although the amicus brief of the Colorado Trial Lawyers Association presents arguments based on the first two *Jones* factors, no one has suggested that there exist "exceptional circumstances" justifying consideration of arguments made only by amici. *Dutcher v. Matheson*, 840 F.3d 1183, 1204 (10th Cir. 2016) (internal quotation marks omitted).

other words, when it comes to recreational services, "individuals are generally free to walk away if they do not wish to assume the risks described in an exculpatory agreement." *Id.* at 1253–54 (original brackets and internal quotation marks omitted).

As for the fourth *Jones* factor—whether the parties' intent to release liability is "expressed in clear and unambiguous language"—we have observed that "[t]he inquiry conducted under this factor should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Id.* at 1255 (internal quotation marks omitted). To make this determination, "we may examine the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions." *Id.* (brackets and internal quotation marks omitted).

Raup makes two arguments based on the third and fourth *Jones* factors. Her argument under the third factor is based on standard contract law. *See* Aplt. Br. at 16 ("The third prong of a recreational waiver analysis is a contract analysis. Ultimately, waiver is a contract. Thus, whether and how it will be enforced requires a garden-variety contract analysis." (internal quotation marks omitted)). She contends that the lift-ticket release was not "fairly entered into" because she "did not receive her lift ticket until after the contract was consummated, and the lift ticket had become non-refundable." Aplt. Br. at 17.[2] We do not consider this argument, however, because she did not make it in

---

[2] Perhaps recognizing Colorado law expressed in *Feeney v. America West Airlines*, 948 P.2d 110, 112–13 (Colo. App. 1997) (passenger who took the flight was bound by language on back of airline ticket and baggage check), Raup does not contest that her

6

district court and has not attempted to explain how it could survive the strict requirements of plain-error review on appeal.  *See Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1306 (10th Cir. 2017) (argument is waived by failure to preserve it below and subsequent failure to argue plain error on appeal).

Raup's remaining argument is based on a composite of the third and fourth *Jones* factors.  She asserts that "[t]he uncontroverted facts demonstrate that an exculpatory contract was not 'fairly entered into . . . expressed in clear and unambiguous language.'" Aplt. Br. at 19–20 (quoting *Jones*, 623 P.2d at 376 (emphasis omitted; ellipsis in Raup's brief)).  She focuses on the small font size of the waiver and the allegedly obscure language.[3]

---

conduct after receiving the lift ticket—that is, electing to ride the lift—was enough to enter into the lift-ticket contract if the contract was otherwise valid.  *See, e.g.*, Aplt. Br. at 22–23 (conceding that district court was "technically accurate" in stating that "under Colorado law, contracts may be formed without signatures of the parties bound by them and without the party having read them").

[3] Judge Briscoe's separate opinion makes additional arguments on behalf of Raup, but we decline to address arguments not adequately preserved by the appellant.  If anything, we have been too generous in addressing Raup's arguments, because she probably did not preserve in district court her obscure-language argument.  *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Aplt. App., Vol. II at 233–36.  In Raup's discussion of this point in the argument section of her district-court response to the motion for summary judgment, she makes no argument based on the circumstances surrounding her obtaining the ticket or general conspicuousness.  *See id.*  Her preserved arguments do not distinguish between this case and one in which the ticket had been mailed to her in advance.  Unlike the separate opinion, we follow this court's practice of considering only contentions raised in the argument section of an attorney's brief.  If courts, either district or appellate, were expected to search for arguments in the statement of facts of an attorney's brief, we would impose an improper burden on opposing counsel to do the same and would create much more injustice than justice.  We therefore do not consider any possible "implicit" arguments contained in the "Response to Movant's Statement of Material Facts" in Raup's response to Vail's motion for summary judgment.  We also

The Colorado Court of Appeals has recently advised that "a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon." *Stone v. Life Time Fitness, Inc.*, 411 P.3d 225, 230 (Colo. App. 2017) (internal quotation marks omitted), *cert. denied sub nom. Life Time Fitness, Inc. v. Stone*, No. 17SC82, 2017 WL 2772252 (Colo. June 26, 2017). In other words, a waiver provision must be accessible to a customer who wishes to read it. It should be legible without resort to a special device (that is, a device unlikely to be readily available), and it should be readily comprehensible by a layperson.

Vail does not dispute Raup's assertion that the warning on the ticket's front and the release on its back both appear to be in five-point font. Certainly anyone who uses reading glasses to read a newspaper would need such glasses to read the language on the ticket. But we agree with the district court that the print, although small, does not require a magnifying glass. And the words "WARNING" and "VOLUNTARILY ASSUMES

note that her cross-motion for partial summary judgment contains no additional argument regarding waiver; it simply incorporates her argument from her response to the motion for summary judgment.

In addition, we are concerned that the separate opinion relies on a photocopy of a ticket to support the argument that the type on the ticket was illegible. We are unwilling to rely on such a photocopy, because of the possible distortions in size and clarity of an image. The original of the ticket is not available in the district-court record. And the copies of tickets in the record are much more legible than the copy attached to the separate opinion. *See also* Fed. R. App. P. 28(j) Notice of Supplemental Authority (Oct. 2, 2017) (explaining that copy of ticket in the record is reduced in size from the copy submitted to the district court). The only argument regarding legibility raised by Raup on appeal is that the size of the font—5-point font, according to Raup—is too small. Although we generally rely on copies of documents in the record, it would be grossly unfair to rely on a defective copy to make an argument for reversal that was not preserved below. If Vail had been alerted in the district court to claims of cramped or fuzzy typography, it could have responded by providing a better copy for the record.

8

ALL RISKS" are printed so as to attract attention to the essentials of the waiver. *See* Colo. Rev. Stat. § 4-1-201(10) (Colorado Uniform Commercial Code provision defining *conspicuous* to include "contrasting type").[4] (In any event, Raup's briefs on appeal do not complain that the language on the ticket is inconspicuous. The words *conspicuous* and *inconspicuous* are not to be found in those briefs.)

As for the alleged obscurity of the exculpatory language, we think laypersons would have little difficulty comprehending "The Holder of this ticket understands and VOLUNTARILY ASSUMES ALL RISKS associated with visiting the Fun Park, including the risks of property damage, personal injury, and death," or "The Holder agrees to not bring any claim or lawsuit against the Fun Park or its affiliates that could arise from the negligence of the Holder or others, including the negligence of the Fun Park operator or its employees." Lift Ticket. The language is readily distinguishable

---

[4] Colorado Rev. Stat. § 4-1-201(10), a provision of the Colorado Uniform Commercial Code, states in full (emphasis added):

"Conspicuous", with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:

(A) A heading in capital letters equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

(B) Language in the body of a record or display in larger type than the surrounding text, or *in contrasting type*, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

from the language in the exculpatory clause held unenforceable in *Stone*. That exculpatory clause was "replete with legal jargon," *Stone*, 411 P.3d at 230, focused on risks very different from those that caused the plaintiff's injury, had a misleading caption apparently referring to some unknown statutes, and had other features heightening the clause's ambiguity, *see id.* at 230–32.

We live in a world where it seems that every product and service comes with numerous warnings and conditions. Most of us pay little or no attention to them. Raup, for example, testified that she did not look at the back of her lift ticket. What *Jones* and the common law require is that the warnings and conditions be reasonably apparent and accessible to the consumer who wishes to be informed. In our view, the ticket satisfied those requirements. We are not persuaded that the lift-ticket waiver is unenforceable under the third or fourth factors of *Jones*.

## B. Statutory Arguments

Raup presents two arguments why the waiver is invalid because of the PLA. She argues (1) that the PLA preempts the common-law defense of release through an exculpatory agreement and (2) that the common-law defense is contrary to public policy established by the PLA.

### 1. Preemption

Raup contends that the PLA "defined the full extent of claims against landowners as well as all defenses available to landowners." Aplt. Br. at 28. In her view, it therefore follows that Vail cannot use the waiver defense because the PLA does not explicitly

10

recognize it.[5]  We disagree.

Colorado enacted the PLA "to protect landowners from liability in some circumstances when they were not protected at common law and to define the instances when liability will be imposed."  Colo. Rev. Stat. § 13-21-115(1.5)(e).  Subsection 3 of the Act sets forth the standard of care owed to trespassers, licensees, and invitees.[6]  Subsection 2 makes clear that subsection 3 sets a limit on the liability of property owners,

---

[5]  Vail contends that Raup waived this argument by not raising it below.  We disagree. Raup argued below that the PLA "abrogate[d] the common law with respect to landowner duties," so "Vail's so called 'ticket waiver' is invalid."  Aplt. App., Vol. II at 296.

[6]  Subsection 3 states in full:

(a) A trespasser may recover only for damages willfully or deliberately caused by the landowner.
(b) A licensee may recover only for damages caused:
(I) By the landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner of which the landowner actually knew; or
(II) By the landowner's unreasonable failure to warn of dangers not created by the landowner which are not ordinarily present on property of the type involved and of which the landowner actually knew.
(c) (I) Except as otherwise provided in subparagraph (II) of this paragraph (c), an invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known.
(II) If the landowner's real property is classified for property tax purposes as agricultural land or vacant land, an invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew.

11

stating: "In any civil action brought against a landowner by a person who alleges injury occurring while on the real property of another and by reason of the condition of such property, or activities conducted or circumstances existing on such property, the landowner shall be liable only as provided in subsection (3) of this section."[7]

Raup relies on the interpretation of the PLA in *Vigil v. Franklin*, 103 P.3d 322 (Colo. 2004). The issue before the court was whether a landowner could invoke the open-and-obvious-danger doctrine as a defense to liability. *See id.* at 323. The court said that subsection 2 of the Act established the state legislature's "intent to establish a comprehensive and exclusive specification of the duties landowners owe to those injured on their property. . . . The plain language preempts prior common-law theories of liability, and establishes the statute as the sole codification of landowner duties in tort." *Id.* at 328. "Consequently," it concluded, "while a landowner may argue that he owes no duty to an injured plaintiff, he may do so only pursuant to the defenses set forth in the statute." *Id.* at 330.

---

[7] The full text of Section 2 is as follows:

> In any civil action brought against a landowner by a person who alleges injury occurring while on the real property of another and by reason of the condition of such property, or activities conducted or circumstances existing on such property, the landowner shall be liable only as provided in subsection (3) of this section. Sections 13-21-111 [relating to comparative negligence], 13-21-111.5 [same], and 13-21-111.7 [relating to construction contracts] shall apply to an action to which this section applies. This subsection (2) shall not be construed to abrogate the doctrine of attractive nuisance as applied to persons under fourteen years of age. A person who is at least fourteen years of age but is less than eighteen years of age shall be presumed competent for purposes of the application of this section.

Vail responds that "the Colorado courts and the Tenth Circuit have routinely analyzed whether waivers of [PLA] claims are valid under the *Jones* factors"—analysis that would be irrelevant under Raup's preemption theory. Aplee. Br. at 32. And it contends that "the only common-law defenses that the [PLA] eliminates are those that relate to the duty of care owed by landowners," so "defenses that do not contradict the [PLA's] standard of care"—arguably including waiver through exculpatory agreements— "are still available." *Id.* at 33. It points to *Union Pacific Railroad Co. v. Martin*, 209 P.3d 185, 189 (Colo. 2009), which held that the PLA does not override Colorado's comparative-fault statute and described *Vigil*'s rule of decision as being "limited to the abrogation of common-law doctrines affecting the duties of landowners." These arguments have some force, but we need not rely on them. A third argument of Vail's is dispositive. We reject Raup's preemption argument because, as pointed out by Vail, the context and language of a post-PLA enactment make clear that the legislative purpose of the PLA is not to bar the waiver defense.

To explain, we must relate some history. In June 2002 the Colorado Supreme Court decided *Cooper v. Aspen Skiing Co.*, 48 P.3d 1229, 1231 (Colo. 2002), which considered a release signed by a mother on behalf of her minor child, relieving a ski club from liability for negligence. The child suffered injuries while skiing and sued the ski club for, among other things, negligence. *See id.* at 1230, 1232. The Colorado Supreme Court ruled that "Colorado's public policy affords minors significant protections which preclude parents or guardians from releasing a minor's own prospective claim for negligence." *Id.* at 1232. By affording minors special treatment, the court seemed to

13

implicitly assume that adults could waive negligence claims for themselves.

More importantly, less than a year later the Colorado General Assembly rejected *Cooper*, enacting legislation stating that "[a] parent of a child may, on behalf of the child, release or waive the child's prospective claim for negligence." Colo. Rev. Stat. § 13-22-107(3) (enacted in May 2003). This language in itself indicates legislative approval of waivers of liability for recreational activity.

But the legislature said much more. Paragraph 1(b) of the statute explicitly states that *Cooper* "has not been adopted by the general assembly and does not reflect the intent of the general assembly or the public policy of this state." Further, Paragraph (1)(a), which we quote in full in a footnote,[8] "finds, determines, and declares" six propositions

---

[8] Paragraph 1(a) states:

> The general assembly hereby finds, determines, and declares it is the public policy of this state that:
>
>> (I) Children of this state should have the maximum opportunity to participate in sporting, recreational, educational, and other activities where certain risks may exist;
>>
>> (II) Public, private, and non-profit entities providing these essential activities to children in Colorado need a measure of protection against lawsuits, and without the measure of protection these entities may be unwilling or unable to provide the activities;
>>
>> (III) Parents have a fundamental right and responsibility to make decisions concerning the care, custody, and control of their children. The law has long presumed that parents act in the best interest of their children.
>>
>> (IV) Parents make conscious choices every day on behalf of their children concerning the risks and benefits of participation in activities that may involve risk;

14

to be "the public policy of this state." These propositions make clear the legislative support for waivers in the recreational context. In particular, subparagraphs I, II, and VI recognize that waivers are essential to the provision of sporting and recreational opportunities:

> (I) Children of this state should have the maximum opportunity to participate in sporting, recreational, educational, and other activities where certain risks may exist;

> (II) Public, private, and non-profit entities providing these essential activities to children in Colorado need a measure of protection against lawsuits, and without the measure of protection these entities may be unwilling or unable to provide the activities;

> (VI) It is the intent of the general assembly to encourage the affordability and availability of youth activities in this state by permitting a parent of a child to release a prospective negligence claim of the child against certain persons and entities involved in providing the opportunity to participate in the activities.

Of course, § 13-22-107 could not have served these purposes if the PLA prohibited all waivers of landowner negligence liability. And we would have to blind ourselves to reality to doubt that the legislature that enacted the statute was assuming that adults could

---

> (V) These are proper parental choices on behalf of children that should not be ignored. So long as the decision is voluntary and informed, the decision should be given the same dignity as decisions regarding schooling, medical treatment, and religious education; and

> (VI) It is the intent of the general assembly to encourage the affordability and availability of youth activities in this state by permitting a parent of a child to release a prospective negligence claim of the child against certain persons and entities involved in providing the opportunity to participate in the activities.

15

waive their own negligence claims to enable themselves to participate in sporting and recreational activities. If there had ever been any question that the PLA accommodates appropriate waivers of negligence, that question was answered when the legislature spoke in § 13-22-107.

This conclusion follows from recognized principles of statutory interpretation. When we interpret a statute, we must look at the context. "Statutory construction is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in the context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Smith v. United States*, 508 U.S. 223, 233 (1993) (ellipsis and internal quotation marks omitted); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 252 (2012) ("Any word or phrase that comes before a court for interpretation is . . . part of an entire *corpus juris*. So, if possible, it should no more be interpreted to clash with the rest of that corpus than it should be interpreted to clash with other provisions of the same law. Hence laws dealing with the same subject . . . should if possible be interpreted harmoniously."). And even if there has been no change in the language of a statutory provision, the change in the surrounding context can require that the construction of the language, even just a word, be modified. *See Smith*, 508 U.S. at 236 ("Even if we assume that Congress had intended the term 'use' to have a more limited scope when it passed the original version of [the statute] . . . , we believe it clear from the face of the statute that the Congress that amended [the statute]. . . did not.").

16

Perhaps at one time it would have been proper to interpret the PLA to bar waivers because it said that "the landowner shall be liable only as provided in [§ 13-21-115(3)]." Col. Rev. Stat. § 13-21-115(2). But the statutory language is hardly unambiguous on that point, *see Union Pacific*, 209 P.3d at 189 (PLA supplants only common-law duties); and that interpretation is not tenable after the enactment of § 13-22-107 in 2003.

## 2. Public Policy

Raup's second statutory argument is that exculpatory agreements like the one at issue here run afoul of public-policy considerations reflected in three pieces of Colorado legislation—the PLA; Colorado's Ski Safety Act, Col. Rev. Stat. §§ 33-44-101 to 114; and Colorado's Passenger Tramway Safety Act, *id.* §§ 25-5-701 to 721.[9] As Vail points out, Raup did not invoke the public policy behind the Ski Safety Act and the Tramway Act below,[10] nor does she assert plain error now. Raup's argument based on these two

---

[9] Confusingly, Raup states that this argument "focuses on *Jones*' first consideration, i.e., public policy." Aplt. Br. at 28. Because Raup expressly declined to press arguments based on the first *Jones* factor below, Raup's association of this public-policy argument with the first *Jones* factor is odd. *See* Aplt. App., Vol. II at 233 ("Plaintiff . . . does not contest [factors one and two]."). We recently observed, however, that "[a]lthough consideration of [the *Jones*] factors is generally sufficient to determine the enforceability of exculpatory agreements, the Colorado Supreme Court has clarified that other public policy considerations not necessarily encompassed in the *Jones* factors may invalidate exculpatory agreements." *Brigance*, 883 F.3d at 1250 (internal quotation marks omitted). Following this lead, we will address Raup's public-policy argument outside the *Jones* framework.

[10] In her reply brief on appeal, Raup cites one sentence from her cross-motion for partial summary judgment, and a four-page portion of her reply in support of the cross-motion, as evidence that it invoked the public-policy considerations of the Ski Safety Act and the Tramway Act below. Neither citation discusses either piece of legislation; they do not preserve the issue.

17

statutes is thus waived. *See Jacks*, 856 F.3d at 1306.[11]

This leaves only the public-policy considerations underlying the PLA. We begin our analysis with an admonition from the Colorado courts: "The power of courts to declare a contract void for being in violation of public policy is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." *Armed Forces Bank, N.A. v. Hicks*, 365 P.3d 378, 385 (Colo. App. 2014).

Raup's PLA public-policy argument is unpersuasive. It points to nothing particular in the PLA that suggests a public policy against exculpatory contracts. The only authority it cites in support is our statement in *Mincin v. Vail Holdings*, *Inc.*, 308 F.3d 1105, 1111 n.2 (10th Cir. 2002), that the PLA "demonstrates that, at least in some circumstances, premises liability is an issue of public concern grave enough to invalidate an otherwise valid exculpatory agreement." Our opinion, however, hardly held that exculpatory clauses are prohibited by the public policy behind the PLA. On the contrary, we affirmed the validity of an exculpatory clause. *See id.* at 1109.

In any event, Raup's argument fails under the analysis we applied in rejecting similar public-policy arguments based on related statutes. In *Brigance* the plaintiff contended that the public policies behind the Ski Safety Act and the Tramway Act made exculpatory waivers invalid. *See Brigance*, 883 F.3d at 1258–59. We observed that

---

[11] Even if Raup had not waived an argument based on these two statutes, this court recently addressed a similar argument in a very similar context. *See Brigance*, 883 F.3d at 1258–59. After a thorough analysis, we concluded that neither statute bars exculpatory agreements. *See id*.

18

while "the [two statutes] identify various duties and responsibilities that, if violated, may subject a ski area operator to liability," they "do nothing to expressly or implicitly preclude private parties from contractually releasing potential common law negligence claims through use of an exculpatory agreement." *Id.* at 1260. Indeed, the plaintiff "[did] not identify a single provision in either the [Ski Safety Act] or [the Tramway Act] suggesting the enforcement of exculpatory agreements in the ski and ski lift context is impermissible or contrary to public policy." *Id.*

The same can be said of the PLA. Nothing in § 13-21-115 expressly precludes parties from executing waivers by exculpatory agreements. The concerns of the statute were unrelated to waivers. Its stated purposes include "to assure that the ability of an injured party to recover [from a landowner] is correlated with his status as a trespasser, licensee, or invitee," Colo. Rev. Stat. § 13-21-115(1.5)(a), and "to create a legal climate which will promote private property rights and commercial enterprise and will foster the availability and affordability of insurance," *id.* § 13-21-115(1.5)(d). Neither goal supports a ban on exculpatory waivers—which would diminish landowners' common-law protections and make insurance less available and more expensive. Certainly this is not the sort of "free from doubt" case that merits voiding a contract on public-policy grounds.

We reject Raup's statutory arguments against the enforceability of the

19

exculpatory agreement on the lift ticket.[12]

### III.   CONCLUSION

We **AFFIRM** the judgment of the district court.  We **DENY** Raup's motion to certify questions of state law.

Entered for the Court

Harris L Hartz
Circuit Judge

---

[12]  Raup has requested that this court certify two questions to the Supreme Court of Colorado.  We decline the invitation and DENY Raup's motion.  When, as here, "we see a reasonably clear and principled course, we will seek to follow it ourselves."  *Sundance Energy Okla., LLC v. Dan D. Drilling Corp.*, 836 F.3d 1271, 1277–78 n.6 (10th Cir. 2016).

17-1039, Raup v. Vail Resorts, Inc.
**BRISCOE**, Circuit Judge, concurring in part and dissenting in part.

I concur in part and dissent in part. I agree with the majority that, in light of this court's recent decision in Brigance v. Vail Summit Resorts, Inc., 883 F.3d 1243 (10th Cir. 2018), we are bound to reject Raup's claim that the exculpatory language printed on the back of her lift ticket was invalid as a matter of public policy. But I disagree with the majority's conclusion that the exculpatory language contained on the back of the lift ticket was expressed in clear and unambiguous language and is therefore enforceable. In my view, nothing—including the warning language printed on the front of the lift ticket—reasonably alerted Raup to the presence of the exculpatory language contained on the back of the lift ticket. I therefore would reverse the district court's grant of summary judgment in favor of Vail on Raup's claim under Colorado's Premises Liability Act (PLA) and remand the case to the district court for further proceedings.

I

*Factual background*

The events at issue in this case occurred at the Breckenridge Ski Resort in Breckenridge, Colorado, which is operated by defendant Vail. During the summer months, Vail operated what was known as the Fun Park at the base of Breckenridge Peak 8. The Fun Park offered the public, for a fee, scenic rides on the Colorado SuperChair chairlift (SuperChair).

On June 25, 2013, Raup visited the Fun Park with her adult daughter, Elizabeth Pyle, and her son-in-law, Jason Pyle. The Pyles purchased tickets for themselves and

Raup to ride the SuperChair that day. Neither the Pyles nor Raup signed a release of liability.[1] Raup may have looked at the front of the ticket before she rode the SuperChair. At the very bottom of the front of the ticket, in capital letters printed in 5-point font, was the following: "IMPORTANT WARNING ON REVERSE.."[2] Aplt. App. at 79, 212. This statement was printed directly below, and was effectively touching, a series of thirteen letters and numbers, which in turn were printed directly below and effectively touching the ticket's bar code.

Raup did not look at the back of the ticket. The back of the ticket included the following language, printed in a small font:

> The Holder of this lift ticket understands and VOLUNTARILY ASSUMES ALL RISKS associated with visiting the Fun Park, including the risks of property damage, personal injury, and death.
>
> The holder agrees to not bring any claim or lawsuit against the Fun Park or its affiliates that could arise from the negligence of the Holder or others, including the negligence of the Fun Park operator or its employees, or from incidents occurring in connection with the natural environment or reasons outside the Fun Park's or its affiliates' control.
>
> The Holder understands that many activities in the Fun Park are self-directed, and that property damage, injury or death to Holder or others may occur as a result of the Holder's own decisions and actions in these activities.
>
> The Holder agrees to read and follow the directions and warnings on all posted signs, and to follow any verbal or written instructions provided by the Fun Park or its employees.

---

[1] The record indicates that in the summer of 2012, Vail required anyone purchasing a ticket for the SuperChair to sign a liability release. Vail apparently abandoned that practice during the summer of 2013.

[2] A photocopy of the front and back of the ticket is attached to this opinion.

> The Fun Park and its affiliates affirmatively deny all liability for any property damages, injury, or death occurring as a result of or related to the Holder's visit to the Fun Park, and the Holder, by use of this ticket, hereby understands and accepts such denial of liability and agrees to hold harmless and indemnify the Fun Park and its affiliates for any claim or lawsuit that may arise as a result of or related to the Holder's visit.

Id. at 80.

Raup and the Pyles, with their purchased tickets, walked to the base of the SuperChair to get on the chairlift. Their intention was to ride the SuperChair to the top and back down without getting off at the top. Raup and the Pyles did not, however, inform anyone at the base of the SuperChair of their intention. Raup and the Pyles presented their lift tickets to the attendant at the base, got on the SuperChair without incident, and began riding to the top.

Near the top of the SuperChair, but prior to the unloading area, signs were posted that said "PREPARE TO UNLOAD/RAISE BAR" and "CHECK FOR LOOSE CLOTHING AND EQUIPMENT." Id. At the top of the SuperChair at the unloading area, there was a vertical sign on the right-hand side that states, "UNLOAD HERE." Id. The unloading area at that time consisted of a flat area at the UNLOAD HERE sign (i.e., the point at which most riders unload), followed by a ramp of unspecified length that declined in elevation by approximately one inch per foot. During summer operations, chairs on the SuperChair travel more slowly than they do in the winter, and as they proceed through the unloading terminal, the chairs automatically detach from the main haul rope and slow to 1.6 miles per hour to allow for unloading.

3

As their chair approached the unloading area, Raup and the Pyles did not raise their safety bar because, as noted, their intention was to ride the chairlift back down the mountain. The lift attendants working at the unloading area signaled for them to raise the bar on their chair in order to get off of the lift. It is disputed whether one of the lift attendants also slowed the lift down so that Raup and the Pyles could get off of their chair more easily. After their chair had traveled past the "PREPARE TO UNLOAD/RAISE BAR" sign, one of the lift operators began waving his arms and yelling at Raup and the Pyles to raise the foot rest and get off the chair. Id at 216.

According to Raup, she and the Pyles did not understand that the lift operators wanted them to get off of the chair until they were approximately five feet from the unloading area. At that point, Raup and the Pyles responded by raising the foot rest, which caused Raup to lose one of her sandals. The Pyles were able to hop off of the chairlift without incident. Raup, however, did not hop off of the chairlift until it was approximately ten feet past the unloading sign, which meant that the unloading platform was approximately ten inches lower than at the unloading sign. More specifically, the seat of the chairlift was approximately 32 inches off of the platform at the point at which Raup hopped off, versus the seat of the chairlift being 22 inches off of the platform at the unloading sign. Shortly after hopping off the chairlift, Raup stumbled and was struck by the chair as it swung around to the left to descend down the mountain. Raup then fell off of the platform and, in the process, sustained fractures to her left femur, tibial plateau, and ankle.

4

*Procedural background*

On March 30, 2015, Raup initiated this diversity action by filing a complaint in federal district court against Vail. Raup's amended complaint asserted two claims for relief. The first claim alleged that "Vail's actions or lack thereof constituted a violation of its obligations to Raup, as an invitee, as set forth in the [Premises Liability Act] at §13-21-115(3)(c), C.R.S." Id. at 14. "Specifically," the amended complaint alleged, "Vail's actions . . . constituted an 'unreasonable failure to exercise reasonable care to protect [Raup] against dangers of which [Vail] actually knew or should have known.'" Id. at 15. The second claim alleged negligence, including negligence per se. Id. In particular, the amended complaint alleged that "Vail was operating a passenger tramway 'while a condition exist[ed] in the design, construction, operation, or maintenance of the passenger tramway which endanger[ed] the public health, safety, or welfare, which condition was known, or reasonably should have been known, by [Vail],' in violation of the provisions of [Colorado's] Tramway Act, at §25-5-706(3)(c), C.R.S." Id. The amended complaint also alleged that "[t]he lift operator was negligent as well in abruptly ordering [Raup] to disembark from the chairlift, . . . as well as not being in a position to and/or choosing not to exercise the safe options of either stopping the chairlift, assisting Raup in getting off of the chairlift, or allowing her to continue to travel down the mountain in the chairlift." Id. at 16.

On June 1, 2015, Vail moved to dismiss Raup's negligence and negligence per se claim, arguing that the PLA "abrogate[d] all common law claims for negligence against a

5

landowner." Id. at 19.  On February 1, 2016, the district court granted Vail's motion.

On May 27, 2016, Vail moved for summary judgment on Raup's remaining claim for relief under the PLA.  In its motion, Vail argued, in pertinent part, that Raup's claim was barred by the exculpatory language that was printed on the back of her lift ticket. Raup filed a response in opposition to Vail's motion.  Raup also filed a cross-motion for partial summary judgment on the issue of waiver.

On January 23, 2017, the district court issued a written order granting Vail's motion for summary judgment and denying Raup's cross-motion for partial summary judgment.  In doing so, the district court concluded that Vail did not owe any special duties to the public or perform essential public services, and that Raup fairly entered into a contract with Vail when she decided to engage in the voluntary and recreational activity of riding a chairlift.  The district court also concluded that the exculpatory language printed on the back of Raup's lift ticket clearly reflected an intent on the part of Vail to extinguish liability, and that Raup's failure to read, or even attempt to read, the warning on the back of the lift ticket did not absolve her from the waiver of liability.  Lastly, the district court rejected Raup's argument that the PLA precluded liability releases as a matter of public policy.

Judgment in the case was entered on January 24, 2017.  Raup filed a timely notice of appeal.

II

Raup argues on appeal that the district court erred in granting summary judgment in favor of Vail. "We review the district court's grant of summary judgment de novo." Pioneer Centres Holding Co. Emp. Stock Ownership Plan v. Alerus Fin., N.A., 858 F.3d 1324, 1333 (10th Cir. 2017). "[B]ecause this is a diversity case, we apply federal law to procedural questions and apply the substantive law of the forum state, Colorado, to analyze the underlying claims." Brokers' Choice of Am., Inc. v. NBC Univ., Inc., 861 F.3d 1081, 1099 (10th Cir. 2017).

Under Colorado law, "[t]he determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court to determine." Jones v. Dressel, 623 P.2d 370, 376 (Colo. 1981). "An exculpatory agreement, which attempts to insulate a party from his own negligence, must be closely scrutinized, and in no event will such an agreement provide a shield against a claim for willful and wanton negligence." Id. "In determining whether an exculpatory agreement is valid, there are four factors which a court must consider." Id. These include: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." Id.

In my view, the fourth Jones factor is dispositive in this case. See Stone v. Life Time Fitness, Inc., 411 P.3d 225, 229 (Colo. App. 2016) (noting that "[t]he validity of exculpatory clauses releasing or waiving future negligence claims usually turns on the fourth Jones factor"). It is undisputed that Raup had the lift ticket in her possession for a

7

short period of time (before presenting it to the lift operator) and may have looked at the front of it. It is also undisputed, however, that Raup did not look at the back of the lift ticket. Further, there is no evidence that any Vail employee verbally alerted Raup or the Pyles to the exculpatory language printed on the back of the lift ticket, nor is there any evidence that there were any signs in the Fun Park alerting Raup and other visitors to the exculpatory language. Thus, the only way that we could say as a matter of law that Raup reasonably knew or should have known about the exculpatory language on the back of the lift ticket is because of the presence of the warning language printed on the front of the lift ticket, i.e., "IMPORTANT WARNING ON REVERSE." The problem with this warning language, however, is that it was printed in an extremely small font—approximately 5-point font—at the very bottom of the ticket. The majority concludes, and I agree, that "[c]ertainly anyone who uses reading glasses to read a newspaper would need such glasses to read the [warning] language on the [front of the] ticket." O&J at 8–9. Moreover, the warning language was positioned directly below and literally touched a series of thirteen larger letters and numbers, which in turn were positioned directly below the ticket's even larger bar code. As Raup argues on appeal, "Vail's reliance on tiny words crowded onto the front of the lift ticket is not sufficient to satisfy the strict scrutiny standard required to enforce an exculpatory agreement." Aplt. Br. at 20. In sum, the warning language was both inconspicuous (a factor that the majority does not discuss) and illegible—at least without use of an assistive device—to a significant percentage of the population. Consequently, I conclude as a matter of law that

8

the waiver language on the back of the lift ticket is unenforceable.

No Colorado cases that I have found address facts similar to those presented here.[3] But the Superior Court of Pennsylvania addressed a somewhat similar set of facts in Beck-Hummel v. Ski Shawnee, Inc., 902 A.2d 1266 (Pa. Super. Ct. 2006). In that case, the plaintiff, her husband, and their two children visited Ski Shawnee in Pennsylvania for the purpose of going snow tubing. The plaintiff's husband purchased four tubing tickets, which he in turn gave to the plaintiff and their children for their use. On the back of each tubing ticket was exculpatory language written in small print. No employee of Ski Shawnee verbally informed the plaintiff or her husband of the existence of the exculpatory language. Neither plaintiff nor her husband read the exculpatory language on the back of the tickets. The plaintiff used her ticket and fractured her ankle while snow tubing. She subsequently sued Ski Shawnee and Ski Shawnee asserted as a defense the existence of the exculpatory language on the tickets. The state trial court granted summary judgment in favor of Ski Shawnee and the plaintiff appealed. The Pennsylvania Superior Court reversed, concluding that "[u]nder the circumstances of this case, where it is undisputed that neither the purchaser nor user of the ticket read its language, and where the language of the ticket itself is not so conspicuous as to, without more, put the

_____

[3] Because the Colorado courts have never before addressed the validity of an exculpatory provision contained on an unsigned document, such as a ski lift ticket, this case is significant and should arguably be addressed by the Colorado Supreme Court in the first instance, rather than by this court. In any event, exculpatory provisions contained on documents of this type surely must be easily noticeable by customers in order to be deemed valid.

9

user/purchaser on notice, we cannot conclude as a matter of law that the disclaimer is enforceable." Id. at 1275. In reaching this conclusion, the court noted that "[t]he disclaimer language on the ticket was in a font size . . . that . . . was just barely readable," and that, consequently, "the disclaimer language on the ticket itself was [not] sufficiently conspicuous such that, without any further indications from the ski facility, a purchaser would be put on notice of its contents." Id.

Much the same can be said in Raup's case. In short, neither the warning language printed on the front of the lift ticket nor any other factor would have reasonably alerted Raup to the exculpatory language printed on the back of the lift ticket. Consequently, the exculpatory language printed on the back of the lift ticket is invalid and unenforceable.

In arriving at the opposite conclusion, the majority states simply "that the print" of the warning language on the front of the ticket, "although small, does not require a magnifying glass." O&J at 9. In other words, the majority focuses solely on the size of the "IMPORTANT WARNING ON REVERSE" language on the front of the ticket and, in doing so, draws a distinction between print, such as that used here, that "anyone who uses reading glasses to read a newspaper would need such glasses to read," and print that "require[s] a magnifying glass" to read. Id. Of course it is true that both the Colorado Supreme Court and the Colorado Court of Appeals have cited with approval a New York Court of Appeals case holding that "'a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon.'" Stone, 411 P.3d at 230 (quoting Gross v. Sweet, 400 N.E. 2d 306, 309 (N.Y.

10

1979)).  But neither the Colorado Court of Appeals nor the Colorado Supreme Court intended for that phrase to serve as the literal or exclusive test for the validity of exculpatory language.  And, indeed, the Colorado Court of Appeals' decision in Stone proves otherwise.  There, the Colorado Court of Appeals held that exculpatory language in a written agreement was invalid, in part, because it "consist[ed] of extremely dense fine print, for which a great many people would require <u>a magnifying glass or magnifying reading glasses</u>."  411 P.3d at 230 (emphasis added).  In short, the Colorado Court of Appeals, unlike the majority in this case, saw no distinction between print that required the use of a magnifying glass and print that required the use of magnifying reading glasses.  Thus, the majority's decision in this case is contrary to the Colorado Court of Appeals' decision in Stone.

Curiously, the majority declines to address "the circumstances surrounding [Raup's] obtaining the ticket or [the] conspicuousness" of the warning language on the front of the ticket, asserting that Raup failed to argue those factors below.  O&J at 7 n.3.  A review of the district court pleadings, however, refutes the majority's conclusion.  In her response to Vail's summary judgment motion, Raup noted under the heading "Plaintiff's Direct Response to Vail's Statement of Material Facts" that "it was the Pyles who purchased the lift tickets and not plaintiff."  Aplt. App., Vol. II at 211.  In that same section of her response, Raup also noted that the warning language was printed "on the very bottom of the front side of the lift ticket."  Id. at 212.  In a subsequent section of her response titled "Plaintiff's Version of the Undisputed Facts," Raup again noted that "her

11

daughter went into the hut and purchased the lift tickets, together with Mr. Pyle, and the party thereafter proceeded to the chairlift where her daughter likely presented the tickets to the lift operator at the bottom of the lift." Id. at 214. In that section of her response, Raup also again noted that the warning was printed "in tiny language on the very end of the front of the lift ticket." Id. at 215. In the argument section of her response, Raup then, as is the usual briefing practice, tied her legal arguments to the preceding factual background she had set forth. Under a heading titled "There Did Not Exist an Enforceable Agreement Between Plaintiff and Vail Whereby Plaintiff Released Them from Liability for Negligence," Raup again noted that the warning language was "in . . . tiny print (likely 5 pt. font) . . . located at the very end of the front side." Id. at 235. She in turn argued that "[u]nder the best of circumstances, this may have alerted a very inquisitive middle aged person, who had brought along her strongest reading glasses, that there was a warning on the reverse side, but certainly not a release agreement." Id. Although Raup never mentioned the word "conspicuous," it is obvious that that was the intent of her repeated references to the font size and location of the warning language on the front of the ticket. Thus, in sum, Raup clearly preserved her arguments regarding the circumstances surrounding the purchase of the ticket, as well as the size and conspicuousness of the warning on the front of the ticket.

The majority also takes me to task for "rel[ying] on a photocopy of a ticket to support the argument that the type on the ticket was illegible." O&J at 8 n.3. According to the majority, it is "unwilling to rely on such a photocopy, because of the possible

12

distortions in size and clarity of an image," and because "[t]he original of the ticket is not available" to us. Id. The majority is well aware, however, that it is the rare case in which we are provided with originals of an exhibit. More importantly, the record on appeal in this case establishes that it was Vail, as the movant for summary judgment, who relied on a photocopy of the lift ticket. Aplt. App., Vol. I at 126. And Raup, in her response to that motion, noted that the photocopied "images of the lift ticket on [Vail's] Exh. 4 appear[ed] to be their actual size." Id., Vol. II at 215. Thus, we are bound to rely on that photocopy in resolving this case. Or, stated differently, it would be wholly improper for us, in deciding whether Vail was entitled to summary judgment in its favor, to infer that the actual ticket might have been more legible than the photocopy provided to us in the record on appeal.

For these reasons, I would reverse the district court's grant of summary judgment in favor of Vail on Raup's claim under the PLA and remand for further proceedings.



**BRECKENRIDGE.COM**

# BRECK SUMMER SCENIC CHAIR
## 1 RIDE (ADULT OR CHILD)
## !!! HAVE FUN !!!
### BRECKENRIDGE SUMMER FUN PARK

8C1
MVASLDAH
5120009488
06/25/2013

**$10.00**

1CMNJK49FHE7V

BR 1 Scenic Chair Ride
RETAIN FOR PROOF OF PURCHASE

1CMNJK49CHE7V
IMPORTANT WARNING ON REVERSE



14